## COLLIER *v.* THE STATE.

The plaintiff in error did not have a fair and impartial trial, in the manner contemplated by law, which is guaranteed to him by the constitution of this State ; and whether the verdict was or was not supported by the evidence, it must for this reason be set aside.   The trial judge erred in overruling the motion for a new trial.

Argued May 19, — Decided July 17, 1902.

Indictment for rape.   Before Judge Fite.   Whitfield superior court.   April 19, 1902.

*W. C. Martin* and *W. M. Jones*, for plaintiff in error.   *Boykin Wright, attorney-general,* and *S. P. Mattox, solicitor-general,* contra.

LITTLE, J.   Collier, the plaintiff in error, was indicted, at a special term of Whitfield superior court, for the offense of rape, and was tried and convicted at the same term.   He made a motion for a new trial, which was overruled, and he excepted.   This motion contains a number of grounds.   These it is not necessary that we should consider and pass on seriatim, for the reason that we have arrived at the conclusion that, for the reasons hereafter given, the accused did not have a fair and impartial trial as guaranteed to him by the constitution and laws of this State, and that, without regard to the evidence which was produced on the trial, the verdict must be set aside and a new trial granted.   We therefore confine ourselves to a consideration of those grounds of the motion which present the reasons why the trial which resulted in his conviction can not be sanctioned by the law.   These are two.   One of them specifies that during the trial, and while the person said to have been assaulted was testifying in rebuttal to the evidence introduced by the defendant, she became very much excited, and began upbraiding the defendant, and the husband of the witness took hold of a chair in a threatening manner as if to strike the defendant with it, but was seized by an officer and forced to take his seat.   At this point the crowd in the court-house became very much excited, got upon the seats, looking and moving towards where the defendant was sitting.   They were commanded by the trial judge to be seated, and this command was, after a little while, obeyed.   Subsequently counsel for the accused moved the court to declare a mistrial on account of this demonstration, and error is assigned on the judge's refusal so to do.   Another ground of the motion states, as a reason why a new trial should be granted, that, while the jury was in its room considering the case, a large number of men collected in the court-room and court-house yard, swearing and using threatening language towards the jury, such as, "If the jury does not hang him, we will," and "We will give the jury until ten o'clock to convict him; and if they don't, we will take him out and hang him." The first of these two grounds was allowed and approved by the presiding judge.   As to the last the judge stated that he knew nothing of the facts therein stated; but at the hearing of the motion a number of affidavits on the part of both the State and the

accused were introduced and read in evidence. Some of these referred to the demonstration which occurred in the court-room during the trial, and others to the demonstrations which occurred in the court-house building and in the yard of the court-house during the time the jury had the case under consideration. It is not necessary that the contents of all these affidavits should be set forth. As to the demonstrations which occurred in the court-room during the trial, as to the meaning of which the affiants differ, and as explanatory of its nature, we have selected and here present the substance of two — one made by Mr. McCamy, of counsel for the defendant; the other by Mr. Maddox, the solicitor-general, who had charge of the case for the State. In the affidavit of the former the following statement is made: "Deponent was present in court when the lady alleged to have been outraged was put upon the stand in rebuttal of the testimony introduced by the deft. During the time she was thus on the stand she grew very much excited, denouncing the deft. very fiercely, turning to him, saying, 'You know you are guilty.' At this time a large portion of the audience, perhaps 200 in number, became very much excited, and, as it seemed to dept., all, or nearly so, came pouring over the benches in a very excited manner, and it seemed to the dept. to where the deft. was, and seemed their intention was to then and there lynch the deft. The judge commanded the crowd to sit down, and rose to his feet, and commanded the sheriff to keep order. But if the crowd was reprimanded for their conduct, deponent does not remember. And if the judge said anything to the jury about the demonstration at the time, or any other time, deponent did not hear it."

The solicitor-general gives his understanding of the matter in the following language: "During the progress of the trial the husband of Mrs. Georgia McPherson, who is alleged to have been raped, was sitting very near deponent. When Mrs. McPherson became excited and was denouncing the defendant, using the language which appears in the brief of evidence and in the motion for a new trial, the crowd in the court-house did not make any demonstration while she was testifying, and until she ceased to testify; and when her husband caught hold of a chair and was seized by the officer and made to take his seat was when the crowd arose, got upon the benches, and made the demonstration complained of. In the opinion of deponent the demonstration was not against the defendant, and would

not have been made but for the conduct of the husband of the State's witness, and it is the opinion of deponent that it was curiosity on the part of the crowd to see what was going on between the officer and the witness, and not a demonstration towards the defendant. When the judge arose and commanded the crowd two or three times to take their seats they immediately did so, and as soon as the officers succeeding in seating the husband of the witness. It is the opinion of deponent that if the husband of witness had remained in his seat and had not made the demonstration towards defendant that he did, and if the officer had not taken hold of him, that there would have been no demonstration from the crowd."

Each of the statements of the two gentlemen named is, of course, to be accepted as giving the facts as each respectively understood them; and so treating them, it is obliged to be conceded that a demonstration on the part of a very large body, for some reason, occurred in the court-room during the progress of the trial, and that this demonstration was made at a time when the husband of the witness was seeking to do violence to the person of the accused in the presence of the court and jury. These gentlemen and other affiants differ in opinion as to what the demonstration meant. In referring to that ground of the motion which was based upon the conduct of the crowd in the court-room, and in the court-house yard after the trial of the case had been completed, and after the jury had retired to their room in the court-house building, quite a number of affidavits, including those of the jurors who tried the case, were submitted. We refer to such of them as we deem necessary to illustrate the rulings which we make. The bailiff, in whose charge the jury had been placed, testified that he carried the jury to the jury-room and locked them up; that he remained at the door of the jury-room during their deliberations; that no one had access to the jury nor the jury to any one; that around the court-house yard there were some noisy demonstrations, and some talking in the court-house, but he does not believe that the jury could have heard and distinguished what was said; that, in the opinion of this witness, the crowd remained at the court-house as a matter of curiosity, awaiting the verdict; that it dispersed about two o'clock in the morning, and the jury did not make and return a verdict until between seven and eight o'clock on the morning after the trial. Two other bailiffs of the court, who were present during the trial,

used this language in affidavits they made: " They were watchful to see that no trouble occurred in the way of lynching; that they were listening, and they heard but one pistol-shot; they made mention of it at the time, and the pistol-shot was not in the court-house yard, or near the court-house, but was some distance away."

Each one of the jurors who tried the case also testified by affidavit. They all agreed in the statement that they were not influenced by any demonstration; that the noise in the court-house yard had no effect upon them as jurors; and that they were controlled alone by the evidence in the case and endeavored to return a proper verdict, and they continued of the opinion that they had done so. Some of the jurors also testified, that while the jury had the case under consideration there were some noisy demonstrations in the court-house yard, but they could not distinguish what was said, nor did they believe that the demonstrations were meant to apply to the jury. Another testified, that he could hear the crowd but not what they said, nor did he pay any attention to this crowd, and nothing said by them had any influence on him. Still another juror, Mr. Foster, testified as follows: " That he was not influenced, in the verdict he rendered, by any demonstration made by anybody on the outside and not connected with the case; that while confined in the jury-room he heard considerable noise in the court-house yard. I heard some one say, 'If they don't make a verdict in 35 minutes, we will'; this is all I understood. This was about eleven o'clock p. m. That the noises in the court-house yard had no effect upon him as a juror in the least; that he was controlled alone by the evidence in the case, and endeavored from the evidence to return what he thought and now thinks was a proper verdict. The jury had the case under consideration all night. The noise in the court-house yard ceased about two o'clock in the morning, and the verdict was not reported and returned into court until between seven and eight o'clock in the morning." Among other affidavits submitted was one from L. H. Crawford, to the following effect: " That he was at the court-house in Dalton, Ga., from about ten to about one o'clock on the night while the jury was out in the case of the State against Bill Collier, tried for rape; and deponent swears that while he was at said court-house there was a boisterous crowd of from fifty to seventy-five people in and around the court-house. Deponent says, occasionally a portion of the crowd would

line up in court-house hall for the purpose of going to the jail, and a time or two they started to the jail and got as far as the well in the court-house yard.   All the demonstration was in the hearing of the jury, as deponent believes the jury heard it.   Deponent says that while he was at the court-house, on said night, he heard a number of pistol-shots which seemed to be between the court-house and the jail."   Another witness, G. M. Cannon Jr., said that "he saw the demonstration in the court-room; saw and heard the crowd around the court-house that night; heard a pistol-shot in the yard or near by; heard loud and boisterous talk like this: 'If the jury does not hang him we will,' or something to that effect.   Crowd remained around court-house until probably 2 o'clock a. m."

This evidence clearly established that a second demonstration was made by the crowd; that is to say, that after the jury had been charged, and had retired to consider their verdict, a very considerable number of people assembled in the court-room near to which was the jury-room, and in the yard of the court-house, and acted in a very boisterous manner.   It can not be doubted, from the evidence, that this demonstration was made against the accused, and it is more than inferable that the purpose of the demonstration was to secure from the jury a verdict of conviction.   It would be mere idle talk to say that the jurors did not understand that the demonstration was against the prisoner on trial.   It is true that each of the jurors testified that the noise and demonstration made by this crowd did not affect his verdict.   Indeed, all of them but one testified that, while they heard the noises, they could not understand what was said.   One of them did clearly understand that some persons in the crowd threatened violence to the prisoner if the jury did not return a verdict of guilty.   It is a little significant that the two bailiffs who were in attendance on the court testified that they were watchful to see that no trouble occurred in the way of lynching, showing evidently that there was a fear that the prisoner would be lynched ; and it is fair to assume that these fears were occasioned by the demonstrations of the crowd.   We have no reason to, and do not doubt that each member of the jury who testified was sincere and honest in his belief that his verdict was in no way affected by the demonstration during the progress of the trial, or by that which subsequently occurred while the jury were considering their verdict.   But the question is, not whether in fact the jurors

were influenced by these demonstrations, but were the demonstra-
tions calculated to influence the jurors in their action? In the case
of *Woolfolk* v. *State*, 81 *Ga.* 551, our present Chief Justice, who
delivered the opinion in that case, referring to a demonstration
made by some one in the court-room, who during the progress of
the trial cried out in an excited and angry tone, "Hang him! Hang
him! Hang him!" said: "All the jurors make affidavit that these
things had no influence upon their minds. . . But can any man
say with certainty that such things have no influence upon him?
Can any of us know how far our minds are influenced by applause
or excitement of a crowd which surrounds us? Can any of us say,
even in this court, that this or that piece of testimony, or this or
that argument of counsel, has not influenced our minds? Can any
of us say that, on the trial of one of the most heinous crimes ever
committed in this State or any other, the applause of the crowd, the
fierce cries of 'Hang him! Hang him!' from members of the
crowd, followed later on by a repetition of the same cry, . . would
have no influence upon our minds? Our minds are so constituted
that it is impossible to say what impression scenes of this kind
would make upon us, unless we had determined beforehand that
the prisoner was guilty or innocent. The question here is, not
what effect these things did have upon the minds of the jury, but
what effect they were calculated to have."

In the case of *Smith* v. *Lovejoy*, 62 *Ga.* 372, Mr. Justice Jackson
said: "The juror's mind might have been influenced by the version
given to the case by the plaintiff, though he did not recognize the
influence himself; therefore, although what he swore he might be-
lieve, yet impressions may have been made favorable to plaintiff
and against defendant." Chief Justice Warner, in delivering the
opinion of this court in the case of *Daniel* v. *State*, 56 *Ga.* 653,
said: "The policy of the law is to protect jurors from all such in-
fluences and temptations in the trial of criminal cases, as well as
defendants who may be injured thereby." So, therefore, in deter-
mining whether the plaintiff in error has any cause of complaint on
account of the demonstrations made in the court-room during the
trial, and subsequently both in the court-room and court-house yard
while the jury were considering the case, the inquiry is not to be
confined to the effect that such demonstrations actually had on the
minds of the jurors, but the question to be determined is whether

the demonstrations referred to were of such a nature as that they were calculated prejudicially to affect the jurors trying the case. Tested by this rule, it is apparent that the defendant did not have a fair and impartial trial, which the law guarantees to him and to which he is entitled, be he guilty or innocent. The heinousness of the crime with which he was charged must not and can not be allowed to affect the manner of his trial; for only by a fair and legal trial can his guilt be so established as to make him subject to the punishment which the law visits on offenders in such a case. Without any reference to the correctness or incorrectness of the verdict rendered in the case under the evidence which was submitted, we must, in deference to the obligations which we have assumed, as we understand them, reverse the judgment of the court below, because the defendant's guilt has not been established by a fair and impartial trial in the manner contemplated by law.

*Judgment reversed. All the Justices concurring, except Lewis, J., absent.*