**James E. MESSER, Jr.,**
**Petitioner-Appellant,**

**v.**

**Ralph KEMP, Warden Georgia Diagnostic and Classification Center,**
**Respondent-Appellee.**

**No. 84–8376.**

United States Court of Appeals,
Eleventh Circuit.

April 30, 1985.

Johnson, Circuit Judge, dissented and filed opinion.

Howard J. Manchel, Atlanta, Ga., for petitioner-appellant.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before RONEY, FAY and JOHNSON, Circuit Judges.

FAY, Circuit Judge:

James Messer, Jr. was convicted of murder and kidnapping with bodily injury in the Superior Court of Polk County, Georgia on February 8, 1980, and was sentenced to death on both charges. On November 23, 1982, after exhausting his state remedies,[1] Messer filed a petition for writ of habeas corpus before the United States District Court for the Northern District of Georgia. The district court denied the petition and Messer appeals. On appeal, petitioner claims that (1) the trial court erred in not declaring a mistrial after an outburst by the victim's father in the presence of the jury, (2) he was denied effective assistance of counsel, and (3) the trial judge erred in not defining "bodily injury" in the jury charge as it pertains to the offense of kidnapping with bodily injury. After careful consideration, we affirm.

## I. FACTS

On February 14, 1979, the half-nude, blood-spattered body of eight-year old Rhonda Tanner was found lying in the woods outside rural Cedartown, Georgia. There were six stab wounds to the body and five knife slashes traversing the victim's abdomen. The little girl's face, neck and upper chest were covered with numerous lacerations and abrasions. Massive bruises and swelling indicated that the little girl's head had been kicked and stomped. Swabs taken from the child's abdomen and vaginal area indicated the presence of sperm.

The following day, local police, along with state and federal agents, arrested the victim's uncle, James Messer, and charged him with the crime. Messer was subsequently indicted by the grand jury of Polk

1. Messer's conviction and sentence were affirmed by the Georgia Supreme Court on March 3, 1981, and a timely motion for rehearing was denied on March 18, 1981. Messer's petition for writ of certiorari before the United States Supreme Court was denied October 5, 1981.

Petitioner thereafter filed a writ of habeas corpus in the Superior Court of Butts County, Georgia and the requested relief was denied on February 23, 1982. On April 20, 1982, the Georgia Supreme Court refused Messer's application for probable cause, and on October 4, 1982, the United States Supreme Court denied Messer's petition for writ of certiorari. The Superior Court of Polk County thereafter entered an order setting Messer's execution date for November 30, 1982.

On November 23, 1982, petitioner filed a petition for writ of habeas corpus, along with an application for stay of execution, before the United States District Court for the Northern District of Georgia. On November 23, 1982, the stay was granted. An evidentiary hearing was then held, and on April 4, 1984, the stay was lifted. Execution was reset for May 8, 1984.

On April 30, 1984, in federal district court, Messer filed a notice of appeal, a request for certificate of probable cause to appeal a motion to stay execution, and a request to proceed in forma pauperis. A stay of execution was granted as was the request to proceed in forma pauperis. The request for certificate of probable cause to appeal was denied. On May 31, 1984, petitioner's application for certificate of probable cause was granted by this court.

County during the November term of 1979, for kidnapping with bodily injury and for the murder of Rhonda Tanner. A jury trial resulted in a guilty verdict against Messer on both charges. Messer was given the death penalty on both the murder and the kidnapping with bodily injury charge.

The facts adduced at trial paint a vivid picture of the events which transpired on that fateful day. Rhonda Tanner left her parents' home early on the morning of February 13, 1979, and boarded the bus which took her to College Street Elementary School in Cedartown. At approximately 2:30 p.m. that afternoon, Messer arrived at the grade school and told the principal, Sam Brabson, that Rhonda's father had been injured in an accident at work and that he was there to pick Rhonda up. Brabson summoned Rhonda from her classroom. When the little girl arrived at the principal's office, she quickly ran to her uncle's side and caressed his hand. Brabson, having no reason to suspect that anything was awry, allowed the child to leave with Messer.

When Rhonda did not get off the bus that afternoon, her mother became worried and drove to the elementary school to look for her. Mr. Brabson told Mrs. Tanner what had transpired earlier and described the individual who picked Rhonda up. Mrs. Tanner immediately contacted her mother-in-law who in turn notified the police and then called Messer's wife. Messer's wife stated that she knew of no reason why her husband would take Rhonda from school.

When Messer arrived home that evening, his wife and his sister-in-law, Pamela Dunn, were waiting for him. Ms. Dunn testified that Messer came in the door cursing and complaining about having spent the entire day at the doctor's office. He then went straight to the bathroom where he immediately changed clothes. In reference to Rhonda's disappearance, Ms. Dunn asked Messer what could be wrong with Rhonda, to which he replied, "I don't know and I don't give a damn." (T. at 243).

The following day, Ms. Dunn was driving down Old Mill Road when she spotted Rhonda's coat lying in some bushes near the railroad tracks. She notified the police and a search of the area was immediately undertaken. By this time, agents of the FBI and the GBI had joined in the investigation of Rhonda's disappearance. Later that afternoon, Rhonda's body was found in a secluded wooded area near the railroad tracks. Her books, pants, and panties were discovered nearby.

Throughout the day, law enforcement officials had been conducting interviews with various witnesses. Retha Wood, an employee at Barber's Service Company, told police that on the morning of Rhonda's disappearance, a man came into the store and inquired about light fixtures and supplies. Mrs. Wood, who was working alone at the store, told police that the man acted rather strangely and kept insisting that she go back to the storeroom to get the supplies he needed. She refused and then called her husband to come to the store. The man immediately left the store but returned later thinking that Mrs. Wood was alone. When Mr. Wood appeared from the back of the store, the stranger again left the premises. At approximately 2:30 p.m., Mrs. Wood saw this same individual drive by the store and look in the window. According to Mrs. Wood, he was heading in the direction of College Street Elementary School.

That night, Mrs. Wood called the police and reported what had happened. Subsequently, both Mr. and Mrs. Wood identified a photograph of Messer as the same man who had been in the store on the day Rhonda disappeared. Even more importantly, the principal and two other witnesses from Rhonda's school had also selected Messer's photograph as being the man whom they saw pick Rhonda up. These witnesses further stated that on the day in question, Messer was wearing a red cap, blue jeans and a tan jacket.

On the evening of February 14, 1979, the day after Rhonda's disappearance, investigators went to a residence to question Messer. He agreed to accompany them to the Cedartown Police Station where he volun-

tarily gave a statement and signed a waiver permitting a search of his house. Messer was not under arrest at this time.

Initially Messer denied killing Rhonda, but when confronted with the fact that witnesses had identified him, he broke down crying and confessed to the murder. Messer stated that on February 13, 1979, he tried to pick up a female employee at Barber's Service Company. That attempt having failed, he drove to College Street Elementary School to get Rhonda. Messer claimed that when he picked Rhonda up at school, he planned to molest her, but not to kill her. He also confessed to telling the school's principal that Rhonda's father had been injured on the job in order to secure Rhonda's release.

Messer then left with Rhonda and drove down Old Mill Road to a secluded area near the railroad tracks. Messer stopped the car and the two of them walked into the woods together. Messer then began to molest Rhonda. When she resisted, Messer told investigators that he beat and stomped her head with his fists and shoes. Messer further stated that he stabbed Rhonda repeatedly and slashed her stomach. Although he denies having raped his victim, Messer did inform investigators that he masturbated at the scene. Messer concluded that he spent approximately thirty minutes in the woods before leaving. Following this confession, Messer was informed by the investigators that he was under arrest.

## II. THE TRIAL

Following Messer's indictment, Attorney John Sawhill was appointed as counsel for the accused. Sawhill was the third attorney appointed by the court. The first two attorneys asked to be relieved and cited community pressure as the reason. On November 9, 1979, Messer entered his plea of not guilty.[2]

The evidence presented against Messer at trial was overwhelming. Mr. and Mrs. Wood had both picked Messer's picture out of a photo lineup as being the man loitering around Barber's Service Company on the day Rhonda disappeared. Mrs. Wood again identified Messer in court and related seeing the defendant driving in the direction of College Street Elementary School just minutes before Rhonda was picked up. In addition, the car which Mrs. Wood described and the license tag number which she wrote down were unquestionably that of the defendant.

Messer's photo was also selected from a lineup by Mr. Brabson, the school's principal, and by his secretary, Jane Hackney. Priscilla Lay, the mother of one of Rhonda's classmates, also was present when the defendant picked Rhonda up and likewise selected Messer's picture out of a photo lineup. At trial, Brabson, Hackney and Lay all pointed to Messer and identified him as being the individual whom they saw take Rhonda Tanner from the College Street Elementary School on February 13, 1979. According to these witnesses, Rhonda took the defendant's hand, stroked it, and pranced about gleefully while she explained that she would not have to take the bus that day because her uncle was there to take her home.

The evidence revealed that Messer was spotted again approximately one hour later as he emerged alone from the woods near Old Mill Road. Robin Sides, a resident of nearby Rockmart, Georgia, was driving in her pickup truck down Old Mill Road at approximately 3:35 p.m. on February 13, 1979. She was on the way to pick up a friend. As she neared the railroad tracks, she noticed a car parked about 50 yards from the side of the road. Sides testified that she did not see anyone inside or near the car but that this did not strike her as being too unusual.

---

**2.** After his indictment, Messer entered a special plea of insanity. Two state doctors examined Messer and found him criminally responsible and mentally competent to stand trial. Defend-

ant's motion for a private psychiatric exam was denied, after which the special plea of insanity was withdrawn.

After picking up her friend, Sides turned her truck around and again proceeded down Old Mill Road. As the two girls approached the parked car, they noticed a man emerging from the woods near the railroad tracks. Sides stopped at the tracks to make sure that a train was not coming. Sides testified: "[H]e scared us both. I don't know ... the way he looked, and ... Lisa said 'you'd better leave,' and I told her ... 'see what kind of car it is and get the tag number.'" (T. at 232–233). The two girls were unable to get the exact number, but they did notice that it was a Polk County plate. When the girls later learned that a murder victim had been found in that vicinity, they immediately related their experience to the police, who by now had begun to suspect Messer. The police drove the girls by Messer's parked automobile and they positively identified it as the one they had seen earlier on Old Mill Road. Moreover, the girls' description of the man whom they saw emerging from the woods was consistent with the descriptions provided by the other witnesses.

The physical and scientific evidence presented at trial was equally overwhelming. Messer knowingly and voluntarily consented to a search of his home. The investigators seized several articles of clothing which matched the descriptions given by witnesses. A footprint found at the scene of the murder was matched to a pair of bloodstained shoes found in Messer's home. Bloodstains found on a pair of Messer's jeans were typed and found to be type O, the same as the victim, Rhonda Tanner. Messer has type B blood. The bloodstains found on Messer's shoes were also analyzed but the quantity was insufficient for typing.

Experts also testified that hairs found on Messer's jeans were characteristically similar to samples removed from the victim's head. Similarly, hairs found at the murder scene were consistent with hairs taken from the defendant's head.

Of course the most incriminating piece of evidence in the state's arsenal is the confession itself. When confronted with the fact that several witnesses had selected his picture out of a photo lineup, Messer fell out of his chair crying and agreed to tell the investigators everything.

At trial, FBI Agent Robert Leary related for the jury Messer's own first-hand account of the murder. According to Leary, Messer admitted trying to pick up a female employee at Barber's Supply Company. He likewise confessed to taking Rhonda from the school under the pretense that her father had been injured. Messer then told Leary that he drove to Old Mill Road, stopped his car, and told Rhonda that they had to go into the woods and find a rock to fix the car's battery. According to Leary, Messer then explained how he began to fondle Rhonda and remove her clothes. When Rhonda started crying, Messer hit her in the face with his fists, knocking her to the ground, and then he stomped and kicked her head. Messer told Leary that Rhonda kept crying, so he stabbed her repeatedly and then slashed her abdomen with his pocket knife. Finally, Messer told the agent that he removed his pants and masturbated over the child's lifeless body.

Agent Leary told the jury that he asked Messer whether he had raped his niece and that Messer responded that he didn't because he didn't want to hurt her. (T. at 371). Leary also explained to the jury that he had asked Messer several questions aimed at testing his story. These questions involved critical details which only the murderer would know, and according to Leary, Messer answered every question correctly.

In the course of this confession, Messer produced the pocket knife with which he murdered Rhonda Tanner. Expert testimony elicited at trial revealed that the victim's stab wounds were consistent with Messer's knife. In addition, blood stains were found on the knife, but the quantity detected was too small to be typed.

Messer also showed the investigators a bruise on his foot which he said he sustained while kicking Rhonda in the head. A photograph of the bruise was admitted at trial.

According to Agent Leary, Messer also drew a detailed map of the crime scene and then used it to outline his every move. This map accurately depicted the area where Rhonda's body was found and, according to Leary, his explanations were consistent with the evidence already compiled.

Finally, it was revealed at trial that Messer had also told the investigators of a pond where he had washed the blood from his knife and discarded his hat. Officers went to the pond and retrieved the hat described by Messer and the witnesses who saw him on the day in question. Expert testimony revealed that hairs found on the cap were characteristically similar to Messer's.

Simply put, if ever there was an open and shut case, this is it. Eyewitness testimony outlined Messer's every move. The physical evidence is uncontroverted and overwhelming. As far as the state is concerned, Messer's confession was simply icing on the cake.

### III. REFUSAL TO DECLARE MISTRIAL

During the trial, FBI Agent Leary related for the jury Messer's own first-hand account of the gruesome murder. At one point, the agent's testimony was interrupted when Wayne Tanner, the father of the victim, lunged toward the defendant screaming and shouting. Messer's first argument is that the trial court erred in not declaring a mistrial as a result of this incident. We disagree.

The following excerpt from the trial transcript depicts the outburst:

AGENT LEARY: He said while they were walking down the railroad embankment Rhonda willingly accompanied him thinking that he was just looking for a rock. After he left the railroad track he went down into the woods a short distance and when he got to the point in the woods he told Rhonda that he wanted to play a game with her, he said at that point he started touching her, he said "down there in between her legs" and thereafter.... now, during this time I'm interviewing him he was crying and had his head in this [sic] hands and some of the statement was just disjointed, the next thing he talked about was that she was laying on the ground and crying. He said to stop her from crying he stabbed her in the chest several times with his knife. He said he couldn't remember the exact number of times he had stabbed her. I asked him did he cut her anywhere other than on the chest and he said he remembered slashing her abdomen with his knife. I asked him if he had or attempted to have sexual intercourse with her and he said no that he hadn't and he said that he didn't try to have intercourse with her because he didn't want to hurt her. I asked him if he took off his clothes ... (At this point and time the Court was disrupted by someone in the audience which was later identified as Mr. Tanner, the father of Rhonda Tanner, which was raging and lunging forward towards the Defendant, and at this time a State Trooper along with other officers seized Mr. Tanner).

MR. TANNER: "... He ... He'll pay! You're liable! ... you'll pay. You'll pay. You're liable. Oh! What you think ... oh you ... you're going to get it ... you....

THE COURT: Let the jury go out to the jury room.

(T. at 371–72).[3]

After the jury was removed, Sawhill immediately moved for a mistrial. The mo-

---

**3.** Following the outburst, the trial judge allowed Sawhill to recite for the record what he had observed in regard to the incident:

MR. SAWHILL: If I'm correct Your Honor, I believe as Agent, Special Agent Leary, was in fact going through his testimony concerning his interrogation of Mr. Messer.... He testified that he asked the defendant at that time why it was that he hadn't had sexual intercourse with the deceased and the response that Agent Leary then followed up with, that the defendant had given him, was to the effect that the defendant did not want to hurt her. At that particular point Mr. Tanner, the deceased's father, sitting on the front row most nearest the jury box did in the manner of a

tion was denied and after curative instructions were given, the trial resumed. Sawhill renewed his motion several times throughout the course of the trial but each time it was again denied.

■ Because the trial judge is in the best position to evaluate the prejudicial effect of a spectator's outburst, the decision on whether to grant a mistrial lies within his sound discretion. *See e.g., United States v. Brooks,* 670 F.2d 148, 152 (11th Cir.1982), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1339 (1982). Absent an abuse of that discretion, this court will not intervene. *Id.* In the instant case, we find no such abuse.

> distraught, upset and outraged father, come forward attempting to cross into the bar area yelling and screaming his intentions as to the defendant and having to be restrained at that time by police officers who was [sic] located at or about him. At that particular time people moving hither and yon and continuing to scream Mr. Tanner had to be removed from the court room. And in fact it was at that time that we took the recess. Does that accurately reflect what occurred?
> THE COURT: I think that accurately reflects what occurred.
> T. at 373–74).

4. Immediately after the outburst, the judge sent the jurors to the jury room and had Mr. Tanner removed from the courtroom. When the jurors returned, they were instructed as follows:

> THE COURT: Ladies and gentlemen of the jury the outburst which you observed during the testimony of Mr. Leary, as you know because he testified in the beginning of the case was the father of the deceased child involved in this case. He was allowed to stay in the court room because he had requested to stay in the court room after his testimony. It is not unusual for family members to be allowed to see and observe a trial. From his testimony obviously he knows nothing about the facts that relate to any guilt or innocence of the defendant and his outburst should have no weight whatsoever with your determination as to the guilt or innocence of this defendant. You are to act only on the evidence as produced to you either by physical evidence or from sworn testimony from the stand and not from any outburst by a member of the family of any one who is deceased or is the recipient of a crime. Now I would like to know if there are any of you who feel this would in any manner bother you or affect you in acting as a juror under the instruc-

■ Our review of the record indicates that the trial court twice instructed the jury to disregard the outburst; once immediately after the outburst, and then again during the sentencing phase.[4] Both times the court inquired as to whether the outburst would in any way affect the jurors judgment, and both times the jury gave no indication that it would. (T. at 379 and 500). After the trial, during a hearing on the defendant's motion for a new trial, each individual juror was called as a witness and each testified that the outburst in no way affected their judgment. (R. Vol. 3 at 49–157). The majority of the jurors also stated that they did not recall any of the other jurors even mentioning the outburst during deliberations or at any other time. *Id.*

> tions of the court at the end of this trial? Are there any who have any feelings whatsoever, and I want you to be very frank and candid with me on this. If you feel that it might in any manner affect your consideration of this case I would like for you to let me know.
> (No response from the jurors).
> THE COURT: I'm going to ask you then to disregard completely any passion or demonstrations shown by this father and I will charge you at the end of the case, but I now want you to determine that your verdict will not in any manner be affected by any outburst in the court room.
> (T. at 379–80).
> At the sentencing phase of the trial, the judge again cautioned the jurors in regard to the outburst:
> THE COURT: Ladies and gentlemen, having found the accused guilty it now would become your duty to fix the punishment for that offense and we would enter into the punishment phase now. In view of the. outburst which occurred during the trial I asked you at that time if there was any problem in your mind, or any question in your mind, whether that outburst could affect your conduct as a juror concerning the guilt or innocence of the accused. In entering the punishment phase I now also would like to ask you if in any manner you feel that could affect you, or be any problem, or in any manner influence your conduct as a juror in the punishment phase of this trial. If you think it would please let let me know.
> (No response from the jurors).
> THE COURT: Again then I caution you that in no manner should anything other than the evidence and your own conscience, and the argument, and the charge of the court influence your verdict.
> (T. at 499–500).

Appellant argues that the question of whether the jurors were influenced by the outburst is irrelevant. Messer cites *Collier v. State*, 115 Ga. 803, 42 S.E. 226 (1905), and *Glenn v. State*, 205 Ga. 32, 52 S.E.2d 319 (1949), for the proposition that the test is whether the outburst was *calculated* to influence the jury in their deliberations. While we agree with appellant that this is the applicable test under Georgia law, we simply do not believe that Wayne Tanner's actions were in any way motivated by a desire to influence the jury. Clearly this outburst, unfortunate as it was, resulted merely from a bereaved father being unable to contain his emotions during a particularly lurid segment of the testimony.

We agree with the trial judge, that the outburst was not calculated to influence the jury and that the curative instructions given by the court were sufficient to counter any prejudice which might arguably have ensued. As the jurors themselves repeatedly indicated, they were in no way influenced by the incident. Accordingly, we find no abuse of discretion on the part of the trial court in not granting defendant's motion for a mistrial.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

### (1) *Argument*

Messer's position is that his attorney, John Sawhill, was ineffective throughout the trial and that he conceded guilt and separated himself from his client during the closing arguments. In addition, Messer claims that Sawhill failed to "humanize" him during the closing arguments of the sentencing phase and that he failed to present all available mitigating evidence. This performance, argues Messer, deprived him of his constitutionally guaranteed right to effective assistance of counsel.

### (2) *Applicable Test*

In *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-part test for ineffective assistance of counsel. In applying that test, this court has noted:

The *Washington* Court held that a claim of ineffective assistance of counsel has two components. *First*, a defendant must show that counsel's performance was deficient by identifying specific acts and omissions. Counsel's conduct, viewed as of the time of the actions taken, must have fallen outside of a wide range of reasonable professional assistance. In assessing a right to counsel's claim, an attorney's actions are strongly presumed to have fallen within that range, and a court must examine counsel's conduct without the use of judicial hindsight.

*Second*, the defendant must show that the deficient performance was prejudicial. The *Washington* Court followed a standard that requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (citation omitted).... A defendant's failure to establish either the performance or the prejudice component results in denial of his Sixth Amendment claim.

*King v. Strickland*, 748 F.2d 1462, 1463 (11th Cir.1984).

 Sawhill has stated that his strategy was to utilize a low-key approach, maintain his credibility with the jury, and then to attempt to humanize Messer during the sentencing phase in hopes that the jury would spare his life. In *Washington*, the Supreme court noted that there are countless ways to defend an individual accused of a crime and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Washington*, —— U.S. at ——, 104 S.Ct. at 2067, 80 L.Ed.2d at 695. Under the standard set forth in *Washington*, a defendant claiming ineffective assistance of counsel must overcome a strong presumption that his attorney's actions might be considered sound trial strategy. *Id.* at ——-——, 104 S.Ct.

at 2066–67, 80 L.Ed.2d at 694–95. The Court has further cautioned that in reviewing the performance of a criminal defense attorney, every effort must be made to "eliminate the distorting effects of hindsight." *Id.* at ——,· 104 S.Ct. at 2066, 80 L.Ed.2d at 694. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.*[5]

### (3) *Innocence/Guilt Phase*

As support for his argument that trial counsel was ineffective throughout the trial, Messer sets forth a number of statistical observations. First, he notes that of the state's twenty-three witnesses, only nine were cross-examined. Messer further complains that Sawhill failed to object to even one of the state's fifty-three items of physical evidence. Petitioner implies that these statistics, in and of themselves, are sufficient to prove ineffective assistance of counsel. In addition, Messer asserts Sawhill's decision not to make an opening argu-

ment or present a case-in-chief as further proof of counsel's overall ineffectiveness.

■ We believe the statistics quoted by Messer do not paint a fair or accurate picture of the representation which he received. True, Sawhill did not object to any of the state's fifty-three items of physical evidence. This crude statistic, however, in no way reflects the numerous occasions on which Sawhill examined witnesses on voir dire in an attempt to find some weakness or legal imperfection on which to base just such an objection. Finding none, Sawhill thereafter allowed the evidence to come in before the jury without challenge. *Compare Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir.1984) (failure to object to evidence already ruled admissible does not render counsel ineffective). We do not find, and the petitioner has not directed us to, a single specific instance where Sawhill's failure to object to physical evidence in some way significantly prejudiced defendant's case. A general observation that trial counsel failed to object to physical evidence does not in itself prove that counsel was ineffective. The second prong of the

---

**5.** Sawhill's closing argument at the guilt phase, in its entirety, is as follows:

BY—MR. SAWHILL:

Your Honor, ladies and gentlemen of the jury, I asked ya'll a lot of questions to begin with about what you were bringing in this court room in the way of knowledge, whether that would affect you in coming in and each and every one of you said it wouldn't and to that and I respectfully recognized each and every one of your responses.

As to what the evidence has been I don't contend what the evidence is, I haven't said anything about it. I would be no less honest with each and every one of you if I tried to tell you the evidence said something other than what Mr. Sammons indicates occurred on that day so I'm not going to. Each and every one of you persons indicated to me that you'd be honest with me in coming into this court room and casting aside anything that you had heard previous to coming in here, it would have no effect on your verdict, no effect on how you looked at the defendant, no effect on how you looked at the evidence. I'm a parent too and I can't explain or give you some easy explanation for why so I won't try.

The judge will charge you the law in this case and with that law that the judge charges

you each and every one of you when you go into that jury room you take with you the evidence that's been received and render a verdict. A verdict that speaks the truth. I don't think in a situation like this there's anything that I can say except to say thank God this is over. I don't know what ya'll are going to believe brought this situation to happen. I have been with this matter nine months and I certainly can't suggest to you why or I'd get on the stand and tell you, I can't do that. At the moment I suggest to each and every one of you what you should do, this is your community and your court and laying aside everything except your common sense and experience, which I dare say there's probably five hundred years worth of it in this jury box right now, I dare say you've got five hundred years of common sense and experience and there is not one bit ... not one bit that's seen anything like this before and I pray to God that none of you or myself, or the other people in this court room, will ever see anything like this again. I'm not going to be dishonest to ya'll and say something to change what is, the evidence is, what the evidence is, the law the judge gives you as to how to consider this evidence. That's all I have. Thank you.

(T. at 482–484).

*Washington* test requires some showing of prejudice as a result of counsel's omission. *Washington*, —— U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. In regard to Sawhill's failure to object, Messer has made no such showing.

■ Much the same can be said for Messer's complaint that Sawhill only cross-examined nine of the prosecution's twenty-three witnesses. Clearly this decision was a tactical one well within the discretion of a defense attorney. When cross-examination was warranted, Sawhill undertook it zealously and competently. Where the testimony appeared to be unrefuted and less critical, Sawhill apparently elected to forego cross-examination. It should also be noted that several witnesses were cross-examined out of the presence of the jury in hopes that something usable would be found. As previously stated, an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance, *id.* at ——–——, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 694–95; *King*, 748 F.2d at 1463, and Messer's general allegations in this respect are simply insufficient to overcome that presumption. Moreover, petitioner has not directed us to a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial. Absent such a showing of prejudice, the second prong of the *Washington* test remains unsatisfied.

In regards to these statistical observations, we question whether they are even specific enough to satisfy the first prong of the *Washington* test. Assuming for the moment that the allegations do raise some question as to counsel's performance, it nonetheless is clear that petitioner has failed to direct us to any segment of the trial where a reasonable probability exists that, but for Sawhill's failure to object or cross-examine, the results of the trial would have been different. Consequently, petitioner's arguments fail to satisfy the second component of *Washington*.

■ We next consider Messer's allegations that Sawhill's performance in regard to opening and closing arguments denied him effective assistance of counsel. Sawhill has stated that his strategy was to use a low-key approach, maintain credibility with the jury, and then to present the human side of his client during the sentencing phase in hopes that the jury would spare Messer's life. In light of Messer's confession and the overwhelming amount of evidence against him, we are not prepared to say that Sawhill's trial strategy was unwise. Sawhill's decision not to make an opening statement is understandable in light of the fact that he accomplished during voir dire what most attorneys set out to do in their opening remarks. Furthermore, his decision not to present a case in chief is in keeping with his stated strategy, and Messer directs us to no evidence which Sawhill arguably could have presented to further his defense.

■ In regard to closing arguments, Messer claims Sawhill conceded his guilt and separated himself from the accused. We have carefully reviewed Sawhill's closing argument and find no express concession of guilt, and nothing to support Messer's contention that he was abandoned by his counsel.[6] If guilt were to some degree implied in what Sawhill said, it was a weak implication at best, and arguably unavoidable in light of the overwhelming evidence and stated trial strategy. This situation differs markedly from the cases cited in appellant's brief where defense attorneys expressly conceded or strongly implied the guilt of their clients. *See Francis v.*

---

**6.** In *Spraggins*, 720 F.2d at 1194–95, we cited with approval the Sixth Circuit case of *Wiley v. Sowders*, 647 F.2d 642 (6th Cir.), *cert. denied*, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981). In *Wiley*, the Sixth Circuit recognized that there is a distinction between a statement which constitutes a tactical retreat, and one which amounts to a "surrender of the sword."

*Id.* at 649. As we noted in *Spraggins*, 720 F.2d at 1194 (emphasis added), it is a *"complete concession of the defendant's guilt"* which constitutes ineffective assistance of counsel. In our opinion, Sawhill's statements did not constitute a surrender of the sword, or a complete concession of guilt, and we therefore refuse to find him ineffective on these grounds.

*Spraggins,* 720 F.2d 1190, 1193 n. 7 (11th Cir.1983) (counsel stated during closing: "I think he went in the house and I think he committed the crime of murder probably...."); [7] *Young v. Zant,* 677 F.2d 792, 797 n. 10 (11th Cir.1982) (counsel stated: "Under the evidence of this case, I only ask you for life."). In light of the totality of the evidence before the jury, we are simply unable to believe that the decision reached by the jury "would reasonably likely have been different absent the [alleged] errors" in Sawhill's closing argument. *Washington,* —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

### (4) *Sentencing Phase*

Messer's next argument regarding ineffective assistance relates to the sentencing phase of the trial. Messer claims Sawhill failed to present all available mitigating evidence and that the only witness which he did present, Messer's mother, was unprepared. Specifically, Messer contends that this lack of preparation resulted in his mother making a damning statement to the effect that Messer anticipated a death sentence. According to Messer, this overall failure by Sawhill to "humanize" him deprived him of effective assistance of counsel. We disagree.

The standard for determining ineffectiveness of counsel is the same for both the guilt and sentencing phase of a trial. *Id.* —— U.S. at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *King,* 748 F.2d at 1463. Accordingly, "[a] defendant challenging a death sentence must show that without the error there is a reasonable probability that 'the balance of aggravating and mitigating circumstances did not warrant death.'" *Id.* (*quoting Washington,* —— U.S. at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698).

Petitioner argues that there were several witnesses available who could have presented mitigating evidence had they been called to the stand. We note, however, that an attorney's actions, including his decision to put a particular character witness on the stand, is given great deference by this court. *King,* 748 F.2d at 1463; *Solomon,* 735 F.2d at 404. We have reviewed Sawhill's testimony from the state habeas proceeding. He thoroughly investigated Messer's background and was familiar with the mitigating evidence which was available. He was very much aware of the possible character witnesses and had spoken to most of them. Sawhill further indicated that he had every intention of calling some of these witnesses, but that for the most part, they appeared reluctant to testify on Messer's behalf. Faced with such a dilemma, we are not prepared to say that Sawhill's decision not to put these witnesses on the stand was unwarranted. *See id.* Even more importantly, we have reviewed the mitigating factors which were to have been introduced by these witnesses, and we find that they do not even begin to tip the balance of aggravating and mitigating circumstances in favor of Messer.

---

**7.** Petitioner's argument is obviously based on that portion of the jury charge where the trial judge recited Ga.Code Ann. § 26–1311(a) (1968) (current version at O.C.G.A. § 16–5–40(a) (1984)), the Georgia Code section defining simple kidnapping. In instructing the jury, the judge stated:

> Code Section 26–1311, and following, defines kidnapping. A person commits kidnapping when he abducts or steals away any person without lawful authority or warrant and hold such person against his will. A person over the age of seventeen commits kidnapping when he forcibly, maliciously, or fraudulently leads, takes, or carries away, or decoys or entices away any child under the age of sixteen years against the will of the

child's parents or other person having lawful custody.

(T. at 491).

Subsection (b) of that statute goes on to set forth the appropriate punishment where the kidnapping is accompanied by bodily injury. The pertinent part of subsection (b) is as follows:

> (b) A person convicted of kidnapping shall be punished by imprisonment for not less than one nor more than 20 years ... Provided ... that if the person kidnapped shall have received bodily injury, the person convicted shall be punished by life imprisonment or by death.

Ga.Code Ann. § 26–1311(b) (1968) (current version at O.C.G.A. § 16–5–40(b).

 We further find no merit to the allegation that Sawhill failed to prepare Messer's mother to testify. To the contrary, Sawhill stated that he discussed her testimony with her on several occasions, and that he decided that the best approach would be to allow her to testify in a narrative fashion. Sawhill further stated that he specifically instructed her not to mention that her son was anticipating the death sentence. We refuse to fault an attorney for the spontaneous exclamation of an emotional witness where the attorney has specifically instructed the witness to avoid that topic.

In applying the *Washington* standard to the sentencing phase, we find that Messer has asserted two specific acts or omissions aimed at proving Sawhill ineffective. As for the argument that there was additional mitigating evidence, we believe that Sawhill was justified in not presenting questionable character witnesses. The evidence indicates that these witnesses were somewhat reluctant to testify on Messer's behalf and it is doubtful whether their testimony would have in any way aided Messer. We further refuse to fault Sawhill for the unanticipated statement by Messer's mother regarding his anticipation of the death sentence. This clearly was not the result of Messer's mother being unprepared to testify. In our opinion, petitioner has failed to show that Sawhill's performance during the sentencing phase was deficient to the extent that this court cannot rely on the result as being just. See *Washington*, — U.S. at ——–——, 104 S.Ct. at 2063–64, 80 L.Ed.2d at 692–93.

#### (5) *Conclusion*

 In order to prevail on an ineffective assistance claim, the second prong of the *Washington* test requires a showing that counsel's errors were so serious that the defendant was deprived of a fair trial. *Id.* at ——, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. As noted by the Supreme Court, however, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than a case of clear guilt supported by confessions and direct evidence. *Id.* at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699; *see also King,* 748 F.2d at 1464. The instant case is clearly within the latter category, and consequently we recognize that petitioner must carry a substantial burden in trying to satisfy the second component of the *Washington* test. *See Boykins v. Wainwright,* 737 F.2d 1539, 1543 (11th Cir.1984). Even if we accept that some of Sawhill's specific actions fell outside the wide range of reasonable professional assistance, we nonetheless are convinced that, under the totality of the circumstances, they in no way affected the ultimate outcome of the guilt or sentencing phase of this trial. *See United States v. Gibbs,* 662 F.2d 728, 730 (11th Cir.1981). Accordingly, we hold that petitioner has failed to meet his "burden of showing that the decision reached would reasonably likely have been different absent the [alleged] errors." *Washington,* — U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

### V. JURY INSTRUCTIONS

 Petitioner's final argument is that the trial judge failed to define bodily injury in his jury charge and that the jury, having never been instructed on this essential element, could therefore not return a verdict for kidnapping with bodily injury. Messer thus contends that he was convicted only of simple kidnapping. If in fact the jury did render its verdict without the benefit of such an instruction, then arguably our decision in *Potts v. Zant,* 734 F.2d 526 (11th Cir.1984), would support petitioner's position. We have reviewed the instructions given, however, and conclude that the trial court did sufficiently charge the jury on the issue of bodily injury.

Petitioner's argument is apparently premised on that portion of the jury charge where the trial judge read verbatim the Georgia Code section which defines simple kidnapping.[8] Granted, if this was all that

---

**8.** Had we agreed with the argument that Messer was only convicted of simple kidnapping, counsel would next have us consider whether that finding rendered invalid any of the statutory

the jury was given, then arguably the instructions would be insufficient. At the beginning of his charge to the jury, however, the trial judge, in discussing the indictment, instructed the jury as follows:

He is also charged in count two with the offense of kidnapping with bodily injury. That count alleges in substance that the accused did on February 13, 1979 in this county unlawfully forcibly maliciously and fraudulently lead, take, carry away, and entice away Rhonda Tanner a child under the age of sixteen years, the said accused being over the age of seventeen years, against the will of Mr. and Mrs. Wayne Tanner the child's parents, *and that the said accused did then and there inflict serious and grievous bodily injuries upon the said Rhonda Tanner, said injuries resulting in her death.*

(T. at 485). (emphasis added). We are of the opinion that this portion of the jury instruction was sufficient to fulfill the trial court's obligation to instruct the jury on this essential element of the crime charged. Clearly the term "bodily injury" is not a phrase which requires an elaborate explanation in order to be understood. We further note that this language serves to distinguish the instant case from *Potts*, where the trial judge never even mentioned the phrase "with bodily injury" in his instruction. *See Potts*, 734 F.2d at 530 n. 1.

Moreover, it is obvious that the jury was well aware that in regard to count two of the indictment, they were dealing with more than just simple kidnapping. The evidence clearly attests to that fact. In addition to being instructed on the nature of the kidnapping charge, it also appears that the jury had the indictment with them in the jury room during their deliberations. Count two of that indictment clearly states

"KIDNAPPING WITH BODILY INJURY" and includes allegations "that the said accused did then and there inflict serious and grievous bodily injuries upon the said Rhonda Tanner, said injuries resulting in her death." (R. Index at 3–4). The jury returned a verdict finding Messer guilty of count two. In this respect, the instant case is markedly different from *Potts*, where the defendant was indicted for kidnapping with bodily injury, but the jury's verdict stated: "We, the jury, find the defendant guilty as to Count Three, *kidnapping.*" *Potts*, 734 F.2d at 530. (emphasis added). In the instant case, there is not the ambiguity and uncertainty alluded to by this court in *Potts, see id.*, and therefore, we find that case distinguishable.

We therefore conclude that the jury was sufficiently instructed on all the essential elements of the crimes charged. Accordingly, petitioner was not denied due process in this respect.[9]

## VI. CONCLUSION

Having reviewed petitioner's allegations, we conclude that the district court's denial of the petition for habeas corpus should be, and is hereby,

AFFIRMED.

JOHNSON, Circuit Judge, dissenting:

James Messer did not receive effective assistance of counsel at the sentencing phase of his trial. Messer's attorney, John Sawhill, knowingly prompted the sole witness on Messer's behalf to testify that Messer expected and was reconciled to receiving the death penalty. Then Sawhill told the jury in his final closing argument that he did not know what to say. He unmistakably implied that, as a parent under these circumstances, he too could accept a

---

aggravating circumstances relied on by the jury in imposing the death penalty. Having held that Messer was in fact convicted of kidnapping with bodily injury, we see no need to continue with a discussion of the second portion of petitioner's argument.

**9.** Had we agreed with the argument that Messer was only convicted of simple kidnapping, coun-

sel would next have us consider whether that finding rendered invalid any of the statutory aggravating circumstances relied on by the jury in imposing the death penalty. Having held that Messer was in fact convicted of kidnapping with bodily injury, we see no need to continue with a discussion of the second portion of petitioner's argument.

verdict directing the execution of his client. This conduct fell outside the "wide range of reasonable professional assistance" guaranteed by the Sixth Amendment, *see King v. Strickland*, 748 F.2d 1462, 1463 (11th Cir.1984), especially since Sawhill's trial strategy was to focus almost exclusively on the sentencing proceedings and the hope that one juror might find mitigating circumstances sufficient to outweigh the aggravating circumstances argued by the prosecution. When Sawhill finished his closing argument, not one advocate remained before the jury for the position that death was not deserved. In my view, Sawhill's conduct at the sentencing phase completely "undermined the proper functioning of the adversarial process," and therefore the sentencing proceedings "cannot be relied on as having produced a just result." *See Strickland v. Washington*, —— U.S. ——, ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 692–93 (1984). Accordingly, I dissent.

## I. THE STANDARDS

The majority opinion has paraphrased generally the two-part test articulated in *Strickland v. Washington* for evaluating a claim of ineffective assistance of counsel. I accept the test as paraphrased but note emphatically at the outset what the Supreme Court described as "the ultimate focus of inquiry":

> [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Strickland v. Washington, supra,* —— U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed.2d at 699. In the present case, whether the sentencing proceedings were fundamentally unfair because they lacked adversarial testing is the critical issue.

In addition, the second part of the *Strickland v. Washington* test—the prejudice inquiry—deserves closer consideration than the majority has given it. The majority accurately relates the standard for prejudice: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. The Supreme Court's careful wording of this standard is of crucial importance here. The likelihood of a different result at the sentencing phase need only be *reasonable*. Messer is not required to show that Sawhill's deficient conduct "more likely than not" altered the outcome in his case. *Id.* at ——, 104 S.Ct. at 2068, 80 L.Ed.2d at 697. As defined by the Supreme Court, the probability of a different result need only be "sufficient to undermine confidence in the outcome." *Id.* Having reviewed the record and, in particular, the transcript of the sentencing proceedings, which includes the testimony elicited from Messer's mother and Sawhill's closing argument, I conclude that a reasonable probability of a different result does exist. Unlike the majority, I cannot say with confidence that Sawhill's conduct "in no way affected" the outcome of the sentencing phase of the trial. To the contrary, it is reasonably likely that, had Sawhill's performance not been deficient, at least one of the twelve jurors would have weighed the aggravating and mitigating circumstances differently.

## II. THE STRATEGY

Sawhill's testimony before the magistrate in the federal habeas proceedings below reveals that, as the trial date approached, he came to fully expect the jury to return a guilty verdict for his client. The evidence against Messer was overwhelming and the possible defenses few. Thus, Sawhill realized before trial that this would be his first case involving allegations of a capital crime to reach the sentencing phase. Sawhill chose to employ a "low-key approach" at the guilt-innocence phase and then attempt to present the "human side" of his client during the sentencing proceedings. The overriding purpose of this strat-

egy was to convince the jury in the sentencing phase that mitigating circumstances outweighed whatever aggravating circumstances the jury might find. Given the overwhelming evidence of guilt, Sawhill's choice of strategy cannot be faulted. *See Warner v. Ford*, 752 F.2d 622, 625 (11th Cir.1985). His execution of that strategy, however, most certainly can.

## III. THE EXECUTION

Sawhill's closing argument at the guilt-innocence phase—which itself comprised a complete breakdown of the adversarial process,[1] though one without the degree of prejudice required under *Strickland v. Washington* —had the unquestionable effect of consolidating all of Messer's defensive efforts into a single win-or-lose attempt at the sentencing phase to avoid the death penalty. It is most significant that this closing argument was made to the same jurors who shortly thereafter would determine Messer's fate. In light of this fact, I find it incomprehensible and certainly detrimental to his purported trial strategy that Sawhill would emphasize the horror of the crime by making the following statements to the jury:

I don't think in a situation like this there's anything that I can say except to say thank God this is over.

. . . . .

I dare say you've got five hundred years of common sense and experience and there is not one bit ... not one bit that's seen anything like this before and I pray to God that none of you or myself, or the other people in this courtroom, will ever see anything like this again.

These comments, under the asserted purpose of establishing the jury's trust, could only have increased Messer's burden of proving in the subsequent phase of the trial that mitigating circumstances outweighed aggravating circumstances. The unreasonableness of these statements is immediately evident when considered in conjunction with the fact that one of the foreseeable issues at sentencing was whether the offense was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of the mind, or an aggravated battery to the victim." O.C.G.A. § 17–10–30(b)(7). Therefore, although Sawhill's closing argument at the guilt-innocence phase does not alone justify

---

1. The majority distinguishes between a "tactical retreat" and a "complete concession" of the defendant's guilt, placing Sawhill's closing argument in the tactical retreat category. Similarly, the majority concludes that the closing argument contained no "express" concession of guilt and any implied concession was "arguably unavoidable."

Fairly speaking, these conclusions are incredible. Only moments after the State's attorney, Mr. Sammons, had argued that the evidence could leave no doubt in the jurors' minds that Messer had killed his niece, Sawhill flatly stated: "I would be no less honest with each and every one of you if I tried to tell you the evidence said something other than what Mr. Sammons indicates occurred on that day so I'm not going to." That, quite simply, was an express concession of guilt. It states affirmatively that only a guilty verdict could honestly be rendered. More importantly, this express concession was not "arguably unavoidable." Sawhill could have said nothing at all. His desire to show the jurors that he was being honest with them in no way required a concession of guilt at this stage of the proceedings. As I understand "prevailing professional norms," *see Strickland v. Washington, supra,* — U.S. at —, 104 S.Ct. at 2066,

80 L.Ed.2d at 695, Sawhill could reasonably have agreed with the guilty verdict, if at all, only *after* it had been returned. Furthermore, under the facts of this case, a trial strategy that mandates a concession of guilt before the jury even considers the question assumes that the jurors will not impartially perform the separate and distinct responsibilities assigned to them at the guilt-innocence and sentencing phases of the trial. In other words, such a strategy assumes that the jury will only find defense counsel credible at the sentencing phase if he previously conceded that his client was guilty. The proper assessment of claims of ineffective assistance cannot tolerate such an assumption. We must presume that the jury was "reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at —, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Nevertheless, the unreasonableness of Sawhill's closing argument at the guilt-innocence phase is alone an insufficient ground for reversal. I agree with the majority that, because the evidence of guilt in this case was overwhelming, Messer cannot establish prejudice. It is not reasonably likely that, had Sawhill not conceded guilt, the jury would have pronounced Messer innocent.

reversal, it did adversely affect Messer's chance of receiving a life sentence in the later proceedings. Moreover, it foreshadowed Sawhill's own implied acceptance of the death penalty in his final closing argument at the sentencing phase.

The testimony elicited from Messer's mother during the sentencing proceedings was the only evidence submitted in his behalf. The mother's narrative account of her son's being beaten by a father who finally left them and his losing his grandfather to suicide poignantly implied a request for sympathy from the jury. Her description of Messer's struggles with his schoolwork and his later commitment to his jobs and his own family similarly paints a picture of a young man deserving pity. In these respects, Sawhill did ensure that at least some mitigating evidence was presented to the jury, though its substance was not corroborated by other witnesses.[2]

The effect of this evidence, however, was completely undermined when the mother answered Sawhill's final question with the statement that she and Messer expected and were reconciled to the death penalty. The statement was not "spontaneous" or "unexpected," as the majority contends. To the contrary, Sawhill knew from previous discussions with Messer's mother exactly how she would answer the question. Sawhill may have instructed her on prior occasions not to mention that Messer was anticipating the death penalty, but at trial he interrupted her narrative with a question that he could only have expected her to answer as she did:

> Q: Has Jimmy told you anything about what he expects is going to happen?
>
> A: Yes. Jimmy and I have talked consistently about it and he and I both, my sister, and my mother expect the death penalty here ..., and since this has happened ..., Jimmy has got saved, he's confessed his sins to Christ, and he told me, he said "mama, the Lord has forgiven me...."

Thus, at the prompting of Messer's attorney, his only mitigating witness related both her opinion and his that the balance of aggravating and mitigating circumstances would yield a sentence of death. To have elicited such testimony was manifestly unreasonable.

---

2. The record reflects some uncertainty as to whether every potential witness who volunteered to appear and testify in Messer's behalf was interviewed by defense counsel. The magistrate found that Sawhill contacted everyone whose name had been furnished to the defense. Yet the record contains affidavits from friends and former employers who state that they notified counsel of their willingness to help but were never contacted. The magistrate's opinion does not mention these affiants. The majority opinion concludes without elaboration that Sawhill spoke to "most" of the character witnesses who were available.

Mitigating evidence was especially important in this case, not simply because of the overwhelming evidence of guilt but because of "the attitude in the small rural county where the murder occurred." *Tyler v. Kemp*, 755 F.2d 741, 745 (11th Cir.1985). The community was outraged, and Sawhill encountered widespread reluctance even among family members to help in Messer's defense. Community pressures against assisting the defense were so pervasive that the two attorneys first appointed to represent Messer asked the trial court if they could be replaced. In these circumstances, the need for mitigating evidence is particularly great, and the attorney's duty to find such evidence and present it effectively increases in direct proportion. *Id.*

Messer had no prior arrest record and had been satisfactorily employed. These facts were neither presented nor argued to the jury as they should have been. *Id.* Messer's honorable service in the military was not mentioned. His church attendance and other religious activities could have been described in detail but were not. I offer no opinion as to whether Sawhill's failure to ensure the presentation of mitigating evidence such as this comprises, in itself, ineffective assistance of counsel. The absence of such evidence, however, most certainly contributed to the total breakdown of the adversarial process at the sentencing phase of the trial. After Messer's mother stated that she and her son were reconciled to the death sentence and Sawhill intimated a similar personal view, all the jury had left for mitigation was the testimony from Messer's mother concerning his past, which was vastly incomplete. *See King v. Strickland, supra*, 748 F.2d at 1463–64 ("attorney's failure to present available character witnesses in mitigation and his weak closing argument constituted both an unreasonable professional performance by the attorney and impermissible prejudice").

Sawhill's closing argument at the sentencing phase reflected a similar reconciliation to the death penalty on his part. Described as a "nonargument" by the magistrate, and not even discussed by the majority, Sawhill's brief argument contained not one reference to the mitigating testimony previously given by Messer's mother. Instead, it focused on the awesome burden placed on the jury in determining Messer's fate and the fortitude that would be required of a juror to decide to let him live, as if the easiest and most obvious verdict were the death sentence. By all reasonable standards, Sawhill simply failed to advocate for his client:

> I dare say, and it has been suggested to me ..., that I ought to argue to this jury to leave him alive is a more cruel punishment because he's got to live with it, so I don't know what to say to you. I really don't.

More importantly, Sawhill intimated that in his opinion as well the balance of aggravating and mitigating circumstances yielded the death penalty:

> [Your decision is] an awesome responsibility and I dare say I would rather be over here than in y'all's seats, because as a parent under these circumstances ... but that's for y'all to decide. [ellipsis in original]

Surely this conduct cannot be explained as a means of establishing the jury's trust. Nor did these statements purport to humanize Messer in any way that I can understand. Moreover, the statements do not comprise a "nonargument," for they were more damaging to Messer than no representation at all. As previously held in *King v. Strickland, supra,* 748 F.2d at 1464, emphasis in closing argument at the sentencing phase on the reprehensible nature of the defendant's crime militates in favor of a finding of ineffective assistance. In my view, the harm caused by Sawhill's statements in this case is at least as great as that caused in *King*.

In sum, despite his acceptable choice of trial strategies in this case, Sawhill's conduct at the sentencing phase in "humaniz-

ing" his client faltered to such a degree that a complete breakdown in the adversarial process resulted. No one addressed the jury and said that Messer did not deserve to die. Incredibly, the testimony and closing argument in Messer's behalf implied just the opposite. Viewed in its entirety, then, Sawhill's conduct at the sentencing phase was clearly unreasonable. The total lack of adversarial testing undermines my confidence in the outcome. A reasonable probability exists that, given a proper adversarial proceeding, at least one juror would weigh aggravating and mitigating circumstances differently. Therefore, I would reverse the decision of the district court and remand for a new sentencing hearing.