CORBI ET AL. *v.* HENDRICKSON ET AL.

[No. 197, September Term, 1972.]

*Decided March 29, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*W. Lee Harrison,* with whom was *Cooper C. Graham* on the brief, for appellants.

*Austin W. Brizendine* for appellees.

DIGGES, J., delivered the opinion of the Court.

While it is sometimes said that music has charms to soothe a savage beast,[1] there are those who consider rock and roll music to be a savage beast that should be slaughtered or at least should be caged and controlled. This seems to be true of the appellees, four husbands and their wives, who own and occupy homes in Baltimore County near Reisterstown, Maryland. Because of the playing of what the appellees called "loud and obnoxious noise and vibrations, sometimes referred to as 'rock and roll'," they filed a bill of complaint in the Circuit Court for Baltimore County against the appellants, Rose Corbi, her son Lawrence, and a corporation owned by them which, trading as the Squires Inn, operates a bar and restaurant located within 300 yards of each of the appellees' homes. By this complaint, these residents sought to have the appellants enjoined from causing "this noise" to be unleashed from their nightclub so as to roam onto the appellees' properties and prey upon their senses.

---

1. This is a frequently misquoted paraphrase of a line from *The Mourning Bride* by William Congreve (1670-1729).

After a full hearing Judge John N. Maguire issued an order which permanently enjoined the appellants "from the playing of loud noise upon their property in such a manner that the noise made by [them] is transmitted onto the properties of the [appellees], or any one of them, so as to deprive [them] and the members of their families, from the reasonable use and comfortable enjoyment of their respective homes." In addition to an appeal from that decree, contained in the same record is a second appeal. This latter appeal followed a subsequent finding by Judge Maguire that the appellants were in contempt of court for violating the injunction.

The facts reveal that the appellees have owned and resided for many years in their homes located near Hanover Road and Mount Gilead Road about three and one-half miles north of Reisterstown. This area was described as rural with "rolling country, very nice farms, well kept and interspersed with family housing." It was considered by these residents as an ideal spot to live if you were "looking for a place in the country where it would be quiet and [you] could enjoy country life and not be bothered by city noises and a lot of people"—an important consideration to many now in this time of ecological awareness. The appellees say that until recently they have enjoyed the advantages of rural living to their utmost—they have pursued such outdoor activities as badminton, picnics, parties, reading and relaxing outdoors, just sitting on the porch, or chatting with neighbors.

Although an inn has existed at the present site of the Squires Inn for a long time, until 1970, when the appellants acquired it, this was not a source of disquietude to the residents of the area; and very little despoiled the bucolic serenity appellees found themselves surrounded by for many years. The original inn operated as a family restaurant and continued to do so even after it obtained a liquor license. Except for an occasional reception or other special affair no music was played there. In 1970, the restaurant was sold and appellants established the

Squires Inn. In lieu of the family restaurant, the appellees now have a rock and roll bar and nightclub as a near neighbor.

From its inception, the appellants began to engage rock bands and since that time such musical luminaries have performed there as Fain Moss, Smash, Appaloosa, Dryed Ice, Cryptic Image, and, appropriately enough, a group called Vibrations.[2] These rock bands generally consisted of four pieces, often an organ, drums, lead guitar and bass guitar, and sometimes a vocalist. The groups, in addition to rehearsing during the afternoons, "did their own thing" four or five evenings a week from 9:00 p.m. to 2:00 a.m.

The appellees variously described the sounds emanating from the inn as "wailing", "howling", "repetitious", "a penetrating boom", "a thump", "a kind of BOOM, BOOM, BOOM", or "brr-ump, brr-ump, brr-ump". These noises, which will "drive through or penetrate everything so that you cannot get rid of it; you cannot hide from it", quickly shattered the residents' tranquility. The appellees found themselves unable to sleep, concentrate on work or study, or practice the piano—perhaps Beethoven. The appellees said that the rock music made it impossible to keep the windows open, or enjoy the outdoors; and, in fact, they were driven to distraction and tears because they could not escape this noise. One of the residents testified that the music hits her in the middle of her abdomen and sometimes when she is sitting in the bathtub she "can hear the vibrations in [her] body."

The appellees, whom the chancellor found to be individuals of exceptional integrity and intelligence, started to complain immediately after the nuisance began. They registered their protest not only with the

---

2. To this list can be added A New Day, 12th Street & 4, Prodigals, Gump, Sage, Abilene, Sentries, and a group depicting the rural atmosphere of the area, Sheep. One band worthy of our particular attention is a group called "Justice". We trust that the sound of our decision will be more acceptable to all than that created by the Squires Inn "Justice".

owners of the Squires Inn but also by resort to the magistrate's court. When these efforts proved unsatisfactory, this suit was instituted. By this action, the appellees seek to have the playing of these loud and annoying noises stopped insofar as they interfere with the reasonable use and comfortable enjoyment of their homes. At no time have they sought to force the appellants out of business or halt the playing of the music entirely. Appellees do not even object to the playing of rock and roll music, they only want it confined so that it does not visit their homes.

The chancellor found as facts, and there is sufficient evidence to support his findings, all we have recited. And, on June 27, 1972 he fashioned a decree granting the requested relief. Appellees apparently are satisfied with this result, as they did not cross-appeal. Believing that the injunctive mandate had not been obeyed, on July 7, 1972 they filed a motion for citation of contempt alleging that the offending noises emanating from the inn had not ceased. After two hearings on the contempt citation, which included the taking of testimony and the receiving of a report of a county policeman who was dispatched at the court's request to visit appellees' homes and listen to the sounds, on August 27, 1972, Judge Maguire found appellants to be in contempt and fined them $1,000. However, the judge stated that there was a possibility that the money would be remitted in six months if there was future compliance with the injunction and no further complaints were lodged. From the granting of both the injunction and the finding that the appellants were in contempt for violating its terms, these appeals were noted.

Here, appellants raise three contentions in hope of obtaining a reversal of either the injunction, the finding of contempt, or both. First, they posit that the chancellor erred when he admitted into evidence, allegedly without a proper foundation, a tape recording made by one of the appellees of the type of music that was annoying them. Second, appellants argue that if the recording

was admissible then Lawrence Corbi should have been permitted to testify about the results of a test he made in court using a decibel meter which showed that the volume of the voice of one of the appellees on the tape was far greater than the actual volume of her voice in court. Finally appellants urge that the chancellor erred when he held appellants to be in contempt.

Before we begin a discussion of these issues, we will quickly set forth the controlling law in this state regarding the enjoining of a noise nuisance. Appellants recognize, as well they must, the precedents in this state which permit such an injunction. And, in fact they are not questioning the authority of the court to fashion such relief or the form in which the injunction was framed. The law is clear in Maryland that though not a nuisance *per se*, any business so conducted as to become such may be enjoined. So, where a trade or business as carried on interferes with the reasonable and comfortable enjoyment by another of his property, a wrong is done to a neighboring owner for which an action lies at law or equity. The decisions of this Court, as well as the courts of our sister states, have recognized that the creation of excessive noise, though incidental to a proper business or recreational activity, may become a nuisance which can be abated. *See, e.g., Carr's Beach v. Annapolis Roads,* 222 Md. 392, 160 A. 2d 598 (1960) ; *Five Oaks Corp. v. Gathmann,* 190 Md. 348, 58 A. 2d 656 (1947) ; *Swimming Club v. Albert,* 173 Md. 641, 197 A. 146 (1938) and cases cited therein. *See also* Annot., *Loud-Speaker as Nuisance,* 23 A.L.R.2d 1289 (1952). In *Albert, supra* at 646-47, a case factually similar to the one now before the Court and which as here involved the creation of a nuisance by the playing of loud music, we stated that:

> "Of greater interest are precedents relating to nuisances due to the creation of noises. From those we find that noise alone, if it be of such a character as to be productive of actual physical discomfort and annoyance to persons of ordi-

nary sensibilities, may create a nuisance, and be the subject of injunction, though such noise may result from the carrying on of a trade or business in a town or city. . . .

Nor is it any answer or defense that the railroad, the street railway, the tooting of automobile horns, may have added to the noises of the locality. No matter how many other separate and independent offenders there may be the defendant must answer for its individual contribution. . . .

It can scarcely be argued that any habitual noise (whether produced by skilled musicians led by the frank and cultivated leaders who testified as here, or by domestic animals, as in *Singer v. James,* 130 Md. 382, 100 A. 642) which is so loud, continuous, insistent, not inherent to the character of the neighborhood, and unusual therein, that normal men, women, and children, when occupying their own homes, however distant, are so seriously incommoded that they cannot sleep, study, read, converse, or concentrate until it stops, is not an unreasonable, unlawful, invasion of their rights."
(Citations omitted.)

With this background, we now turn to an examination of appellants' specific complaints.

Appellants' first contention is that the chancellor committed reversible error when he admitted into evidence, over objection, a tape recording of the type of music emanating from the Squires Inn. Mrs. Wooden, one of the appellees, testified that in order to record the music audible in her home at night she borrowed a Wollensak, 3 M, solid state recorder from Mr. Mays, another of the appellees. She made the recording by placing the microphone in an open bedroom window. She further stated that the tape offered in evidence, which has been in her possession since its recording, is a reasonably accurate reproduction of what she heard that evening. Mr. Mays

also identified the recorder, stated it was a very simple machine to operate and that he instructed Mrs. Wooden on its use and was present a part of the time she operated it. He also testified that he listened to the recording and it was a "reasonable facsimile of what the noise sounds like."

With this foundation, the chancellor received the tape in evidence for the limited purpose of informing him, as the trier of fact, of the "type of sound, the type of noise." But, he sustained the objection as it related to the volume of the music and stated that the tape would not be considered for that purpose. Here, appellants argue that the foundation laid for the introduction of the tape into evidence was inadequate. Additionally they suggest that:

> "since the recordings were made by Mrs. Wooden at her house, the volume of the sound was bound to be a factor which could not be left out of the deliberations of the Court. *There was also more than adequate testimony to the type of music being played in the Inn of the Appellants. So the tape could not possibly have any bearing on the case, unless either volume was considered, or an ingrained distaste to the type of music being played was involved.* In either case, the admission of the tape was improper." (Emphasis added.)

Appellants' latter argument does not require an extensive discussion. Since the chancellor affirmatively stated that he was admitting the tape for a limited purpose, there is no reason to indulge in speculation that he exceeded that purpose or transgressed beyond his announced guidelines. In any event there is no evidence even remotely suggesting that he did so. As to the first part of the argument, we recognize that current advances in the technology of electronics and sound recordings make inevitable their increased use in court proceedings. While such recordings are prone to abuse,

distortion, tampering and other infirmities, they can prove of evidentiary value if the use of such devices is properly safeguarded. There has been much scholarly writing and case decision on the proper foundation necessary for the introduction of sound recordings under various conditions and circumstances. *See, e.g., United States v. McKeever,* 169 F. Supp. 426 (S. D. N. Y. 1958), *rev'd on other grounds,* 271 F. 2d 669 (2d Cir. 1959) ; *Steve M. Solomon, Inc. v. Edgar,* 92 Ga. App. 207, 88 S.E.2d 167 (1955) ; *Wilms v. Hand,* 101 Cal. App. 2d 811, 226 P. 2d 728 (1951) ; Annot., *Sound Recordings in Evidence,* 58 A.L.R.2d 1024 (1958). The tests as enunciated in the various legal writings may have different variations, and emphases, but all agree that sound recordings, if otherwise competent, are admissible if a proper foundation is established. It is unnecessary for us to decide here what the proper foundation for the admissibility of such a tape would be in all circumstances and for all cases; nor must we determine if the chancellor was correct here in limiting the purpose for which the tape could be considered. However, we think that for the limited purpose for which it was admitted, a proper foundation was laid and the evidence was correctly considered. We note that the admission of such recordings in similar circumstances to those here has been approved by courts in other jurisdictions. *See Wilms v. Hand, supra; Frank v. Cossitt Cement Products,* 97 N.Y.S.2d 337, 197 Misc. 670 (1950). Even if we assume that it was error to admit the recording, in view of all the other evidence in the case, the appellants have failed to meet their burden of showing that the error had a prejudicial effect on the outcome of the case. *State Roads Comm. v. Kuenne,* 240 Md. 232, 213 A. 2d 567 (1965). In fact, the appellants themselves recognized that there was "more than adequate testimony to the type of music being played," and "the tape could not possibly have any bearing on the case." Under these circumstances, even assuming the admission of the tape was error, it was harmless. *Air Lift, Ltd. v. Bd. of*

*Co. Comm'rs,* 262 Md. 368, 400-01, 278 A. 2d 244 (1971) ; *State Roads Comm. v. Kuenne, supra; Rippon v. Mercantile-Safe Dep.,* 213 Md. 215, 131 A. 2d 695 (1957).

The appellants' second argument need not detain us long. They contend that since the tape recording was admitted into evidence they should have been permitted to testify about the results of a decibel meter test they conducted that compared the volume of Mrs. Wooden's voice in court to the volume of her voice on the tape. In light of the fact that the tape was not admitted in order to examine the volume but only to hear the type of offending music, the offered evidence is of doubtful relevance. But even if it were relevant, the admission of the results of such an experiment rests within the sound discretion of the trial judge and we discern no abuse of that discretion here. *Smith v. State Roads Comm.,* 240 Md. 525, 214 A. 2d 792 (1965).

The final contention is that in view of the obvious efforts being made to correct the nuisance there was not sufficient evidence to justify the chancellor's conclusion that the appellants were in contempt. However, we need not decide that issue as we think this finding must be vacated and the case remanded for further consideration in light of our holding in *State v. Roll and Scholl,* 267 Md. 714, 298 A. 2d 867 (1973). In *Roll* we made a thorough analysis of the law of contempt in this state. There we discussed the problems of categorizing a contempt as civil or criminal, direct or constructive, and once the classification has been properly made, the procedures that must be adhered to in each case. Here it is unclear how the contempt proceeding was conducted, though apparently it was tried as a civil constructive contempt. If that is so, aside from other possible procedural defects, no proper civil penalty containing the requisite purging clause was imposed.

It was indicated to us at oral argument that the appellants may have made sufficient structural changes to confine the music played at the Inn to that property; and, therefore, further proceedings may be unnecessary

at this time. But, if contempt proceedings are to be pursued by means of constructive civil contempt, either now or later, certain procedural requirements must be followed and the penalty must provide for purging. If there is to be a constructive criminal contempt proceeding based on the violation of the court's injunction, the procedures as well as the nature of the penalty appropriate to such a proceeding must be followed.

> *Decree of June 27, 1972 enjoining the transmittal of loud noises affirmed.*
> *Order of August 22, 1972 holding the appellants to be in contempt of court vacated and case remanded for further proceedings.*
> *Costs in both appeals to be paid by appellants.*