No. 85–5571. MESSER v. KEMP, WARDEN. C. A. 11th Cir. Certiorari denied. JUSTICE BLACKMUN dissents from the denial of the petition for writ of certiorari. 

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Petitioner in this case, James Messer, was sentenced to death by a jury that was unable in any meaningful fashion to give him the "individualized consideration" to which he has a constitutional right, *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978) (plurality opinion), because of egregiously unprofessional assistance by his trial counsel. I believe that petitioner has clearly met the standard that this Court set in *Strickland* v. *Washington*, 466 U. S. 668 (1984), for establishing ineffective assistance during the sentencing phase of his trial, and I would accordingly grant the petition and vacate petitioner's sentence.

I

Petitioner was convicted of kidnaping and murdering his 8-year-old niece. After his conviction and sentence were affirmed on direct review, he sought a writ of habeas corpus in state court, alleging, *inter alia*, ineffective assistance of counsel. The court declined to hold a hearing, made no findings, and denied the writ. Petitioner then sought federal habeas relief. The Magistrate to whom the case was referred recommended that the writ be granted as to the sentence, concluding that petitioner had received ineffective assistance during the penalty phase. The District Court nevertheless denied the writ. It concluded that petitioner had not established prejudice, as required by *Strickland, supra,* and therefore did not reach the question whether counsel gave adequate assistance. The Court of Appeals affirmed, 760 F. 2d 1080 (CA11 1985), with one judge dissenting, *id.*, at 1093 (Johnson, J.).

II

The only factfinder that has considered the question, the Federal Magistrate, found that petitioner has met the first *Strickland* criterion—that counsel's performance at the sentencing phase was "outside the wide range of professionally competent assistance,"

*Strickland, supra,* at 690. Even the most cursory review of petitioner's trial demonstrates that the Magistrate's conclusion was inescapable.

At petitioner's hearing before the Magistrate, counsel testified that he had decided as a matter of strategy to adopt a "low-key" approach during the guilt phase, in hopes of establishing credibility with the jury. He had then hoped to "humanize" petitioner during the sentencing phase and try to convince the jury to spare petitioner's life. 760 F. 2d, at 1088. Both the majority and the dissenter in the Court of Appeals concluded that this strategy was not unreasonable in light of the overwhelming evidence of petitioner's guilt. *Id.,* at 1090, 1095.

Counsel succeeded admirably in implementing the first part of his strategy. He made no opening statement and put on no case in chief. He performed only cursory cross-examination, and did not object to any evidence. *Id.,* at 1089. Counsel's attempts to carry out the second prong of his strategy, however, were piteously deficient. His brief summation during the guilt phase, after acknowledging his "frustration" with the case, App. B to Pet. for Cert. 14 (opinion of District Court), went on to "emphasize the horror of the crime," 760 F. 2d, at 1095 (Johnson, J., dissenting), to the very jury that would soon be called upon to determine whether the murder was "outrageously or wantonly vile, horrible, or inhuman," Ga. Code Ann. § 17–10–30(b)(7) (1982).

During the penalty phase, counsel put on a single witness, petitioner's mother. She testified concerning petitioner's childhood, which was marred by mistreatment at the hands of his father and his parents' subsequent divorce. The effect of this implied plea for pity, however, was then destroyed when counsel, despite having previously warned the witness to avoid the topic, asked her what petitioner had told her about his expectations. She replied "he and I both, my sister, and my mother expect the death penalty here." 760 F. 2d, at 1096.

It was counsel's summation during the penalty phase, however, that led the Magistrate to conclude that petitioner's Sixth Amendment right to counsel had been violated. His statement, which the Magistrate called a "nonargument," *id.,* at 1097, made no mention of petitioner's mother's testimony nor of any other mitigating

evidence.* Counsel did not inform the jury, during summation or at any other time, that petitioner had no prior criminal history, had been steadily employed, had an honorable military record, had been a regular churchgoer, and had cooperated with the police. See *id.*, at 1096, n. 2. Counsel did not give the jury a single reason why it should spare petitioner's life. As the Magistrate noted, counsel "utterly failed to point out any matters which were favorable to [petitioner]—to 'humanize' him, even though this was his alleged 'tactic.'" App. C to Pet. for Cert. 51 (Magistrate's Report and Recommendation). Instead, counsel repeatedly hinted that death was the most appropriate sentence for petitioner. He "focused on the awesome burden placed on the jury in determining Messer's fate and the fortitude that would be required of a juror to decide to let him live, as if the easiest and most obvious verdict were the death sentence." 760 F. 2d, at 1097.

The net result was that petitioner was without an advocate at the sentencing phase. "No one addressed the jury and said that Messer did not deserve to die." *Ibid.* Like the Magistrate and the dissenter in the Court of Appeals, I cannot help but conclude that a total breakdown in the adversarial process occurred in this case.

### III

The District Court rejected the Magistrate's conclusion because it felt that petitioner had not established the second *Strickland* criterion—that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland, supra,* at 694. The Court of Appeals held that counsel's performance was not constitutionally deficient. Yet it never even mentioned counsel's summation nor the Magistrate's finding that the summation was unreasonable and ineffective. I can only presume that the Court of Appeals failed to find prejudice as to the summation, based on its conclusory statement that "petitioner has failed to show that [counsel's] performance during the sentencing phase was deficient to the extent that this court cannot rely on the result as being just." 760 F. 2d, at 1092 (citation omitted).

---

*Counsel's summation at the penalty phase, in its entirety, is set out in an Appendix to this opinion.

The result below is thus an example of the gross unfairness that results when the *Strickland* prejudice standard is applied without regard to the special characteristics of a capital sentencing proceeding. See *Strickland*, 466 U. S., at 715–717 (MARSHALL, J., dissenting). Those proceedings have a much different function than the relatively mechanical inquiry of the guilt phase, and the likelihood that an appellate court can accurately divine a jury's probable response to evidence or arguments is accordingly less. Just last Term this Court reiterated that a capital defendant has a constitutional right to the consideration of "[w]hatever intangibles a jury might consider in its sentencing determination." *Caldwell* v. *Mississippi*, 472 U. S. 320, 330 (1985); see also *Lockett* v. *Ohio*, 438 U. S. 586 (1978) (defendant has constitutional right to consideration of mitigating factors). Yet as applied by the courts below, *Strickland* permits unprofessional conduct by trial counsel to deprive a capital defendant of that right.

Viewed in the correct light—that is, considering what the jury in this case might have done if presented with a true adversarial debate on the appropriateness of sentencing petitioner to death—one cannot possibly conclude that there is no "reasonable probability" that the outcome would have been different. This is not a case in which, despite unreasonable errors by counsel, the jury was presented with a substantially accurate picture of the defendant and with some cogent argument in favor of life. The jury here was never apprised of several substantial mitigating factors. More important, counsel presented the jury with no reasons to spare petitioner's life and, indeed, strongly intimated that he could think of none.

Despite these strong indicia of unreliability, the District Court found the absence of prejudice as to the *sentencing* phase based primarily on its conclusion that the evidence of petitioner's *guilt* was overwhelming, App. B to Pet. for Cert. 3, and the Court of Appeals blithely assumed the jury's role, finding the result "just," 760 F. 2d, at 1092. If the *Strickland* prejudice standard has any vitality at all, it requires a more searching inquiry than that. I dissent.

### APPENDIX TO OPINION OF MARSHALL, J., DISSENTING

"Your Honor, ladies and gentlemen, since ya'll were selected I might add I haven't taken the opportunity to talk to ya'll a lot

but I have been honest and in that honesty I haven't tried in any form or fashion to do anything other than see that the facts in this case were presented and they were very ably presented, there's no question about that.

"Now, I knew that when I got involved in this case at the beginning they would be. The question in this case is not the facts. Twenty-nine times I said 'no questions.' Thirty times I said 'no objections' to a witness being excused. Each and every one of us knows the young girl died. Like Mr. Foster, I have two young children of my own and believe you me that makes it more difficult for me to stand here in front of you all right now, each and every one of you, than it does for Mr. Foster, I dare say. I don't ask you to appreciate that. I don't ask for that at all. I just want to be straight up and honest about this whole thing and where we're all coming from. Each and every one of you in this jury box know before this case started, or had some slight idea, that we were going to be at this point today where we are now and the decision was going to come down to the twelve of you and what you determine to be Mr. Messer's fate.

"I dare say, and it has been suggested to me, and I say this in all humble candor, by some both here and in Rome that I ought to argue to this jury to leave him alive is a more cruel punishment because he's got to live with it, so I don't know what to say to you. I really don't. I know that at this particular point there is no question in my mind that the verdict this jury spoke in this court room today was the truth. I don't contest that at all. The question is when the judge tells you what the law is in this situation and what is considered to make something aggravating circumstances, what is considered to mitigate circumstances, he's also going to tell you that in a situation like this you can almost disregard those and leave it up to yourselves, your gut feeling as to what it is you feel speaks the voice of the community.

"Now, the community, a great part of the community, has been here in this court room as potential jurors and as members of the audience, and it concerns Polk County. Interestingly enough Judge Winn told me two weeks ago that he didn't think there would be anyone here by the end of the trial that it had been a long time since there had been a trial like this and the last time a good many years ago he could remember that there just wasn't ten or fifteen people by the time the trial got done with, people were just that uninterested. But that's not true in this situation

because people have been very interested, and very interested right now with what is this community's voice through ya'll going to be.

"Unfortunately I do not agree again with Mr. Foster as to his position that each and every one of you by rendering a verdict that speaks for the death penalty are being brave. In not doing that you're showing people outside of Polk County that you don't know how to deal with people who take the lives of others in Polk County. That's not the issue. Nor is it the bravest thing to do in this situation to vote the death penalty. It would take a heck of a lot more guts to say that there's something in that human being who sits over there, sits over there having to remember what ya'll have just learned about him. There's something that put him on this earth and it's worth leaving on this earth. Ya'll have the power to extinguish him from this earth, a legal right to do that if you so desire. The District Attorney does not have that right. You are but his implement to do that, each one of you, all twelve of you, to the extent that you choose to use that the law allows each and every one of you to do it. That's an awesome responsibility and I dare say I would rather be over here than in ya'll's seats, because as a parent under these circumstances . . . but that's for ya'll to decide. Please however, as the judge will charge you, the decision is each and every one of yours individually and then as a group, your decision be it give him life or death is your decision, you need not worry about what happens after that decision as to how it's carried out. That makes it a lot easier as far as the decision is concerned in having to live with it but it's still your decision, and if your decision is life that is a decision that you have come about to make freely and honestly based upon all that you've heard in the case and there might be some reason to leave this man on the face of the earth then hold onto that decision, if not then let it go, but make it your own decision each and every one of you, don't make it a decision of your friends and neighbors that you just adopt. I dare say ten years ago had any of you ever pictured yourselves being in this situation and having to make this decision ten years from then you wouldn't.

"Thank you." Tr. 516–519.