540 A.2d 1125

**Flint Gregory HUNT**

v.

**STATE of Maryland.**

**No. 53, Sept. Term, 1987.**

Court of Appeals of Maryland.

March 31, 1988.

496

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Valerie J. Smith, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Gary E. Bair, Asst. Atty. Gen., on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

MURPHY, Chief Judge.

Appellant Hunt was convicted by a jury in the Circuit Court for Baltimore City of the first degree murder of a police officer and sentenced to death. He was also convicted of (1) using a handgun in the commission of a crime of violence and (2) unlawfully wearing, carrying, or transporting a handgun, for which he received consecutive sentences, respectively, of twenty and three years' imprisonment. In light of *Booth v. Maryland,* 482 U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the death sentence will be vacated and a new sentencing hearing held on the capital conviction because a victim impact statement was improperly admitted in evidence at the sentencing hearing.

Hunt frames four issues for our consideration on this appeal: (1) whether a mistrial should have been granted when at trial members of the slain officer's family became emotionally upset in the jury's presence and had to leave the courtroom upon hearing a tape of a police recording transmitted immediately prior to and after the officer's murder; (2) whether Hunt was denied a fair trial due to the presence of jail guards in the courtroom during the trial, and because one or more correctional officers were required to accompany him to bench conferences; (3) whether the trial court erred in admitting evidence of Hunt's flight after the crimes were committed; and (4) whether the trial court erred in imposing separate and consecutive sentences for both the use of a handgun in the commission of a crime of

violence and unlawfully wearing, carrying, or transporting a handgun.

## I

While on patrol the evening of November 18, 1985 at approximately 5:20 p.m., Officer Vincent Adolpho noticed a new Cadillac with a missing window covered with plastic. In addition to the driver, the vehicle contained three other occupants. The officer, following a routine stolen car inquiry, learned that the car had been stolen. He broadcast a description of the occupants of the car and noted that the driver was "not breaking any laws right now."

Two officers in separate patrol cars, responding to Officer Adolpho's request for back-up, attempted to block the path of the on-coming Cadillac. Upon nearing the roadblock, the driver, later identified as Hunt, jumped out of the car while it was still moving and ran up a nearby alley. The Cadillac then struck one of the parked patrol cars and stopped; an officer detained the three passengers who were still in the car.

Officer Adolpho pursued Hunt into the alley. Upon apprehending him, the officer positioned him against a wall and tried to handcuff Hunt. Hunt pushed away, knocking the officer off balance. Hunt then pulled a .357 Magnum from his jacket and shot Officer Adolpho in the chest at close range. Within seconds, as the officer reeled from the first shot, Hunt shot him again, this time in the back. Hunt fled the scene of the crime. Officer Adolpho was pronounced dead at the hospital at 6 p.m.

In the meantime, Hunt had called his friend, Angelo Williams, and asked him to keep the gun for him, saying that he had just shot a policeman. Hunt and his girl friend, Deborah Powell, then went to his sister's house, only to leave when a television broadcast indicated that Hunt was being sought in connection with the murder. Hunt's sister later testified at trial that Hunt had seemed fine at the time, although Ms. Powell said that Hunt had been taking

drugs earlier that afternoon and appeared "high" when he had left her.

The next day, Hunt and Powell drove to Camden, New Jersey. En route, Hunt admitted to Powell that he had shot the policeman. Hunt then boarded a bus to Santa Monica, California, leaving Powell behind. He was apprehended at a Tulsa, Oklahoma bus station five days later.

In addition to the testimony of both Williams and Powell that Hunt admitted shooting the officer, a ballistics expert testified that the bullets removed from Officer Adolpho's body matched the gun later recovered from Williams's place.

## II

During the trial, a tape of police radio communications recorded at the time of the shooting was admitted over objection; while the tape was being played, members of the victim's family left the courtroom. Hunt now argues that the trial judge erred both in admitting the tape and in not declaring a mistrial when the victim's family displayed signs of emotional distress in front of the jury. We find no merit in either contention.

Prior to trial, defense counsel moved to exclude Officer Adolpho's widow from the courtroom when the tape was to be played in anticipation of her crying when she heard it. The trial judge denied the motion, finding that he could not "close the courtroom doors to her." At trial, when the tape was played, there was a reaction by some person or persons in the courtroom, in response to which defense counsel moved for a mistrial, stating: "[S]everal members of the victim's family had to exit the courtroom, and they were crying as they exited the courtroom." The trial judge, after noting that the family "left quietly" and caused "no disturbance," refused to grant the motion.

Hunt now asserts that the emotional reaction of the family, particularly of the wife, is "tantamount to victim impact evidence," the use of which in a capital prosecution

violated the precepts of *Booth v. Maryland, supra. Booth* relates to the sentencing phase of a capital case and holds that the use of victim impact statements offended the Eighth Amendment to the United States Constitution. In *Booth*, members of the victims' family "were articulate and persuasive in expressing their grief and the extent of their loss." 482 U.S. at ——, 107 S.Ct. at 2534, 96 L.Ed.2d at 450. The victims' son said that his parents were " 'butchered like animals.' " *Id.* at ——, 107 S.Ct. at 2535-36, 96 L.Ed.2d at 451-52. The victims' daughter expressed similar sentiments, saying that animals wouldn't kill as brutally as the murderers had; and that they should never be released as she didn't want another family to have to go through what her family had endured. These emotionally-charged remarks, the Court said, could only serve "to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.* In contrast, the effect on the jury in the present case of seeing some individuals, not identified to the jurors on the record, quietly departing when they were apparently emotionally moved by the recording does not even begin to approach the emotional remarks found impermissible by the Supreme Court in *Booth*.[1] Thus, assuming arguendo the applicability at the trial stage of *Booth's* rationale, the prejudice apparent in *Booth* is simply not present here.

Nor can we find on the record in this case that the trial judge erred in not granting a mistrial. The conduct of criminal trials falls within the sound discretion of the trial judge which will not be disturbed absent a clear abuse of discretion. *Smith v. State,* 299 Md. 158, 179, 472 A.2d 988 (1984); *Poole v. State,* 295 Md. 167, 180, 453 A.2d 1218 (1983); *Wilhelm v. State,* 272 Md. 404, 413, 326 A.2d 707 (1974). Of course, the trial judge is in the best position to

---

1. Although Hunt maintains that it was "obvious" to the jury that those who left were members of the victim's family, this is not affirmatively established in the record. Spectators, as well as family members, have not infrequently become upset during trials. Displays of sentiment and emotion are not limited solely to family members.

evaluate any prejudicial effect the presence or actions of the officer's family may have had on the jury. In this regard, the trial judge, prior to trial, took several precautionary measures to ensure that the trial would not be disrupted. Before permitting the recording to be played in court, he listened to the tape in chambers. He was therefore able to assess beforehand whether any portions of the tape were particularly gruesome or sensational as might evoke a strong emotional reaction from those listening to it. Secondly, the judge directed that the officer's family be advised that they "must maintain decorum at all times," which was done. Finally, when the trial began that day, the judge noted on the record that the family members were composed at the time.[2]

Emotional responses in a courtroom are not unusual, especially in criminal trials, and manifestly the defendant is not entitled to a mistrial every time someone becomes upset in the course of the trial. In *Messer v. Kemp*, 760 F.2d 1080 (11th Cir.1985), *cert. denied*, 474 U.S. 1088, 106 S.Ct. 864, 88 L.Ed.2d 902 (1986), an FBI agent was on the stand recounting the accused's own depiction of how he had murdered a child. The child's father became enraged and lunged toward the defendant, shouting that the defendant would pay for what he had done. In spite of this action, the court upheld the trial judge's refusal to grant a mistrial, reasoning that the trial judge was best able "to evaluate the prejudicial effect of a spectator's outburst." *Id.* at 1087.[3] Moreover, unlike the record in the present case, the record in *Messer* discloses precisely what occurred in the courtroom when the father attempted to attack the defendant. Without the incident preserved in the record, we cannot speculate as to what transpired, but rather defer to the trial

---

**2.** The record also indicates that a request had been made that Officer Adolpho's wife be seated inconspicuously in the courtroom.

**3.** Although a curative instruction had been given to the jury in that case and none was here, neither was one asked for. Hunt concedes that an instruction was not requested for tactical reasons so as not to draw more attention to the incident.

judge's assessment. *See Bart v. Bart*, 182 Md. 477, 481, 35 A.2d 125 (1943) (court must decide cases upon the face of the record).

Finally, courts from other jurisdictions have overwhelmingly held that the determination of whether a new trial or mistrial should be granted because of allegedly prejudicial behavior on the part of victims' families or courtroom spectators is largely within the sound discretion of the trial judge, and only rarely will the judge's ruling be disturbed. *See generally People v. Montgomery*, 743 P.2d 439 (Col. App.1987) (upholding refusal to grant mistrial when victim cried during closing argument); *Hallman v. United States*, 410 A.2d 215 (D.C.App.1979) (not abuse of discretion to deny motion for mistrial when spectator began to cry); *Forney v. State*, 255 Ga. 316, 338 S.E.2d 252 (1986) (mistrial not required when wife of murder victim cried openly during trial); *Battle v. State*, 254 Ga. 666, 333 S.E.2d 599 (1985) (no abuse of discretion in refusing to grant mistrial because mother of murder victim cried quietly in court); *State v. Morales*, 32 Ohio St.3d 252, 513 N.E.2d 267 (1987) (emotional outburst by victim's brother did not deny defendant a fair trial); *Hope v. State*, 732 P.2d 905 (Okla.Cr.1987) (no abuse of discretion in allowing victim to remain in courtroom even though she had previously cried); *Landry v. State*, 706 S.W.2d 105 (Tex.Cr.App.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 242, 93 L.Ed.2d 167 (1986) (emotional display by victim's family did not unduly prejudice defendant). Significantly, no abuse of discretion was found in any of these cases even though the emotional reaction was often characterized as an "outburst," admittedly more likely to impact upon the jury than was the case here. Thus, considering the protective steps taken by the trial judge, and his assessment that Officer Adolpho's family remained calm as they left, we conclude that the trial judge fairly exercised the discretion vested in him.

In view of the right to public trials guaranteed by the Sixth Amendment, the court must exercise considerable discretion in excluding family members or other members

of the public from the courtroom. *See Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980). This discretion should be exercised sparingly and motions for mistrial, based on the presence of a member of the victim's family, should only be granted under urgent or very extraordinary and striking circumstances. *See Wilhelm v. State,* 272 Md. 404, 430, 326 A.2d 707 (1974). Moreover, this determination will not be disturbed absent a clear showing of prejudice to the defendant. *Johnson v. State,* 303 Md. 487, 516, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). Of course, the burden is on the movant to establish prejudice, *see Adams v. United States,* 317 U.S. 269, 281, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942) and we find that Hunt has not met that burden. Assuming the jury realized that it was the officer's family which left the courtroom upon hearing his voice again, and reliving the events leading up to the shooting, we cannot find that this was the sort of extraordinary circumstance that would lead to injustice when, as here, the trial judge did not grant a mistrial.

Hunt also argues that the trial judge erred in admitting the tape itself into evidence, contending that it had little or no probative value, and prejudicially engendered passion and emotion in the jury. We think the admissibility of this evidence was within the discretion of the trial judge, which he did not abuse. *See Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244 (1979).

Once a proper foundation has been laid, tape recordings are generally admissible if otherwise competent. *Corbi v. Hendrickson,* 268 Md. 459, 467, 302 A.2d 194 (1973); *Raimondi v. State,* 265 Md. 229, 232–33, 288 A.2d 882 (1972), *cert. denied,* 409 U.S. 948, 93 S.Ct. 293, 34 L.Ed.2d 219 (1972). The tape of the police broadcast was clearly relevant in the circumstances of this case. Officer Adolpho was a witness to the incident and although he was not available to testify, his observations were preserved on tape; they provided an important first-hand account of the

events leading up to the shooting.[4] The officer's trans-missions identifying the occupants of the car, and that the driver was not breaking any laws, were clearly relevant as to identity and as to Hunt's perceived mental state, both of which were at issue during the trial.[5]

Hunt suggests that it was unduly prejudicial for the jury to hear the officer's voice when a transcript of the tape was available which would be less likely to inflame the jury. As a general rule, the trial judge may exclude relevant evidence if the danger of unfair prejudice substantially outweighs its probative value. *See Cross v. State,* 282 Md. 468, 474, 386 A.2d 757 (1978). The mere fact that the jury heard Officer Adolpho's voice, instead of reading his words in the transcript, was not unfairly prejudicial in our view. Nor was the tape itself unusually sensational so as to inflame the passions of the jury—no gun shots were record-ed, nor were any screams of anguish heard. The tape merely depicted routine radio transmissions up to the point of the shooting and, at the most, exclamatory remarks afterwards. The actual shooting itself was not recorded. As the State properly maintained, the tape supplied the jury with a sense of timing not apparent on the transcript, which was probative as to premeditation on the part of Hunt.

Hunt also argues that the introduction of the tape was unnecessary as six witnesses were available to testify in a less prejudicial manner to the same evidence. This does not, however, render the tape inadmissible—it served

---

4. The officer's remarks fall within the present sense impression excep-tion to the hearsay rule recently recognized in *Booth v. State,* 306 Md. 313, 508 A.2d 976 (1986). Under this exception, out of court state-ments made while the declarant is actually perceiving an event which describe what he observes are admissible even though the declarant is later unavailable in court.

5. Hunt had asserted that due to his alleged drug intoxication, he could not have formed the requisite mental state for premeditated murder. Officer Adolpho's observation that Hunt was not breaking any laws or acting suspiciously tends to negate Hunt's contention that he was under the influence of drugs.

to corroborate the testimony of the other witnesses. Additionally, tapes tend to be more reliable as they are not susceptible to the memory or perception problems present with live testimony.

Moreover, even though the transcript of the events was available, the judge was not required to admit the least damaging form of evidence to the defendant. A like issue arises in relation to the admissibility in evidence of photographs of victims of crime. Although such may be more graphic than other available evidence, like autopsy reports, we have seldom found an abuse of a trial judge's discretion in admitting them in evidence. *See Grandison v. State*, 305 Md. 685, 729–30, 506 A.2d 580 (1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 38, 93 L.Ed.2d 174 (1986); *Johnson v. State*, 303 Md. 487, 502–04, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Snowden v. State*, 133 Md. 624, 631, 106 A. 5 (1919). Thus, we conclude that the trial judge did not abuse his discretion in admitting the tape.

## III

Prior to trial, the prosecutor requested that the trial judge rule on whether Hunt, who was wearing shackles at the time, must wear them throughout the trial. Defense counsel objected to the use of such restraints in front of the jury, arguing that this would unduly prejudice Hunt. Before ruling on the matter, the trial judge requested background information on Hunt. He was subsequently advised of Hunt's major criminal record, which included armed robbery and assault convictions; of an adverse evaluation by a psychiatric hospital describing Hunt as having an "anti-social" personality; and that Hunt had fled following the murder of the officer and was later apprehended in Oklahoma. With this information, the trial judge also considered the allegation that witnesses, who would have to walk past Hunt to get to the witness stand, had received death threats of unknown origin. After reviewing this information, the trial judge said that additional security was

warranted. Consequently, correctional officers from the Baltimore City jail, in undisclosed numbers, supplemented the normal courtroom security force. The trial judge furthermore ruled, agreeing with the defense, that keeping Hunt shackled in the courtroom would be unduly prejudicial; thus he ordered that the shackles and handcuffs be removed before Hunt entered the courtroom and replaced when he left. During pretrial voir dire proceedings, Hunt objected to correctional officers accompanying him to "each and every" bench conference; the trial judge overruled the objection. Hunt now argues that he was denied a fair trial because of the presence of additional correctional officers in the courtroom, and because one or more of them accompanied him to the bench conferences.

As earlier observed, the conduct of a criminal trial is committed to the sound discretion of the trial judge and will not be disturbed absent a clear abuse of discretion. *Smith v. State*, 299 Md. 158, 179, 472 A.2d 988 (1984); *Poole v. State*, 295 Md. 167, 453 A.2d 1218 (1983). Moreover, it is the trial judge's responsibility to maintain order in the courtroom. *Calder v. Levi*, 168 Md. 260, 274, 177 A. 392 (1935). And the judge is allowed considerable discretion in the matter of courtroom security. *See McCloskey v. Boslow*, 349 F.2d 119 (4th Cir.1965); *Feldman v. Director*, 5 Md.App. 60, 66–67, 245 A.2d 830 (1968).

Under the circumstances, we hold that the trial judge did not abuse his discretion in requiring additional security in the courtroom. The more troublesome issue involves the guard or guards accompanying Hunt to bench conferences. Hunt contends that the presence of the guards at the bench conferences inferred to the jury that he was dangerous, and also interfered with his ability to consult with counsel. As there is absolutely nothing in the record indicating that counsel had problems conferring with Hunt, we will address only the first of these contentions.

In *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), four uniformed, armed state troopers

were seated during a criminal trial in the first row of the spectators' section of the courtroom; they were in addition to regular courtroom security measures. Rejecting the appellant's claim that he did not receive a fair trial because of the officers' presence, the Supreme Court held that the need for additional security in view of the appellant's past criminal record and his personality disorders provided sufficient justification for the additional guards. Moreover, some degree of prejudice is acceptable when the State has sufficient justification for the level of security employed. 475 U.S. at 571, 106 S.Ct. at 1347. Finally, the Court also noted that although the defendant's guilt or innocence must be determined by the evidence presented, this does not mean that all reminders of his alleged guilt must be eradicated to guarantee him a fair trial.[6] *Id.* at 567–68, 106 S.Ct. at 1345–46.

Hunt points out that in *Holbrook* four state troopers, seated "at some distance from the defendants," were guarding six people, whereas here the guard or guards accompanied him, in close proximity, to the bench conferences. We note that in *Holbrook* the state troopers were uniformed and armed and that the correctional officers in the present case were dressed only in blue pants and white shirts— there is no indication in the record that they were armed or otherwise uniformed. Moreover, the record is silent as to what actually transpired at the time of the bench confer-

---

**6.** The relationship between the defendant's presumed innocence and the need for courtroom security was explicated in *United States v. Samuel,* 431 F.2d 610, 615 (4th Cir.1970):

"However, the right to the indicia of innocence is a relative one. The judge presiding at the trial, the jurors, courtroom personnel and spectators are entitled to security in the performance of their functions or in observing the trial. The members of the public out of the courtroom are entitled to security in the pursuit of their daily activities. The public also has an interest in the expeditious trial of persons accused of crime, and an interest in preventing the guilty from being at large and committing other offenses. Thus, in appropriate circumstances, the accused's right to the indicia of innocence before the jury must bow to the competing rights of participants in the courtroom and society at large."

ences.[7] Other than defense counsel's pretrial request at the voir dire proceeding that the correctional officers not accompany Hunt to bench conferences, there is no indication that this actually occurred, or if it did, how often or with how many guards. Not being disclosed by the record, we are unable to determine whether Hunt suffered any prejudice. *See Bart v. Bart, supra; State Hwy. Adm. v. Transamerica Ins.*, 278 Md. 690, 702, 367 A.2d 509 (1976) (insufficient information in the record for the Court to review the propriety of the disputed ruling); *Johnson v. Nadwodny*, 55 Md.App. 227, 238, 461 A.2d 67 (1983) ("matters not ascertainable from the record should not be factually relied upon in argument").

## IV

Hunt further asserts that the trial judge erred in admitting evidence that he fled the scene of the crime after the shooting. That evidence of flight from justice is admissible to show awareness of guilt is well settled. *Huffington v. State*, 295 Md. 1, 16, 452 A.2d 1211 (1982), *cert. denied*, 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986); *Jones v. State*, 242 Md. 323, 327, 219 A.2d 77 (1966); *Davis v. State*, 237 Md. 97, 105, 205 A.2d 254 (1964), *cert. denied*, 382 U.S. 945, 86 S.Ct. 402, 15 L.Ed.2d 354 (1965); *Tasco v. State*, 223 Md. 503, 509, 165 A.2d 456 (1960), *cert. denied*, 365 U.S. 885, 81 S.Ct. 1036, 6 L.Ed.2d 195 (1961). *See also McCormick on Evidence*, § 271 (3d ed. 1984); *Wigmore on Evidence*, § 276 (rev. 1979).

Hunt urges that we now reconsider these cases, contending that flight does not necessarily indicate guilt, *i.e.*, that people may flee for other reasons unrelated to culpability, such as panic or fear.[8] He notes that others

---

7. The only notation in the transcript is that "counsel and defendant approached the bench" or that "counsel and defendant returned to trial tables."

8. In support of his position, Hunt cites four cases criticizing the rule. *See, e.g., Wong Sun v. United States*, 371 U.S. 471, 483 n. 10, 83 S.Ct.

were in the alley at the time of the shooting and that "one, ... perhaps two" people also fled. He maintains that it cannot be inferred that they fled because of a guilty conscience. Hunt also argues that his actions may have been unrelated to the shooting—he could have been fleeing because he had just been stopped for driving a stolen car.

The record discloses that not only did Hunt flee the scene, but he also orchestrated elaborate plans to flee the jurisdiction. In admitting the evidence of flight, the trial judge may have found it unlikely that Hunt would have hid out on the night of the crime; driven to another state the next day; and sold his jewelry to purchase a bus ticket to California, if he was concerned only about a stolen vehicle charge. Of course, we have never held that evidence of flight is conclusive as to guilt. *See Price v. State*, 227 Md. 28, 33, 175 A.2d 11 (1961). We think the trial judge did not err in permitting the jury to consider these matters as circumstantial evidence of Hunt's guilt of the murder; it was for the jury to then decide whether Hunt's flight related to the stolen car, to the murder, or to another unconnected reason.

## V

As a final matter, Hunt asserts that in view of constitutional double jeopardy principles and the doctrine of merger by legislative intent, it was improper to sentence him to consecutive terms for the two handgun violations. As stated earlier, Hunt received twenty years (as a subsequent offender) for the use of a handgun in the commission of a crime of violence, Md. Code (1987 Repl.Vol.), Art. 27, § 36B(d) [9] and an additional three years for unlawfully

---

407, 415 n. 10, 9 L.Ed.2d 441 (1963) (evidence of flight of dubious probative value); *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977) (inherent unreliability of evidence of flight); *Cooper v. United States*, 218 F.2d 39, 41 (D.C.Cir.1954) (innocent people may become terror-stricken in certain circumstances); *Vick v. United States*, 216 F.2d 228, 233 (5th Cir.1954) (impermissible to speculate as to defendant's motive for fleeing).

**9.** Section 36B(d) provides in pertinent part:

wearing, carrying, or transporting a handgun, Art. 27, § 36B(b).[10]

The record shows that Hunt put the gun in his jacket at approximately 3:30 p.m., drove around for two hours, and then shot Officer Adolpho with the gun at 5:30 p.m. Assuming, without deciding, that the two offenses are not the same for double jeopardy purposes, we think separate and consecutive sentences were improperly imposed in this case. The doctrine of merger by legislative intent (the Rule of Lenity) operates as a rule of statutory construction. *Dillsworth v. State*, 308 Md. 354, 519 A.2d 1269 (1987). In enacting § 36B, the legislature made clear its purpose to restrict the carrying of handguns as a measure to control the use of such weapons in the commission of crimes of violence. Section 36B(d) expressly provides for consecutive sentences for both the use of a handgun in the commission of a crime of violence and for the underlying crime itself. Section 36B(b) contains no express language authorizing multiple punishments. We think it plain that the legislature did not intend, under circumstances like those now before us, that a separate punishment would be imposed for carrying, wearing, and transporting a handgun consecutive to that imposed for using a handgun during commission of a crime of violence. We thus find in this case that the § 36B(b) offense merged into the greater § 36B(d) offense of using a handgun in the commission of a crime of violence. *See State v. Jenkins*, 307 Md. 501, 515 A.2d 465 (1986); *State v. Boozer*, 304 Md. 98, 497 A.2d 1129 (1985);

---

"Any person who shall use a handgun ... in the commission of any felony or any crime of violence as defined in § 441 of this article, shall be guilty of a separate misdemeanor and on conviction thereof shall, in addition to any other sentence imposed by virtue of commission of said felony or misdemeanor ... [which sentence] shall be served consecutively and not concurrently to any sentence imposed by virtue of the commission of said felony or misdemeanor."

10. Section 36B(d) provides, *inter alia,* that "[a]ny person who shall wear, carry, or transport any handgun, whether concealed or open, upon or about his person ... shall be guilty of a misdemeanor."

*Whack v. State,* 288 Md. 137, 416 A.2d 265 (1980); *Dillsworth v. State, supra.*

AS TO THE OFFENSES OF MURDER IN THE FIRST DEGREE, AND USE OF A HANDGUN IN THE COMMISSION OF A CRIME OF VIOLENCE: JUDGMENTS AFFIRMED, EXCEPT AS TO THE SENTENCE OF DEATH IMPOSED AT THE CAPITAL SENTENCING PROCEEDING; DEATH SENTENCE VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW CAPITAL SENTENCING HEARING.

AS TO THE OFFENSE OF WEARING, CARRYING, OR TRANSPORTING A HANDGUN: JUDGMENT VACATED.